05-5129-cv
Merrill Lynch v. Allegheny Energy

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued October 30, 2006                    Decided August 31, 2007)

Docket No. 05-5129-cv

_____

Merrill Lynch & Co. Inc., Merrill Lynch & Capital Services, Inc.,
ML IBK Positions, Inc.,

Plaintiffs-Counter-Defendants-Appellees,

v.

Allegheny Energy, Inc., Allegheny Energy Supply Company, LLC,

Defendants-Counterclaimant-Appellants.

_____

Before:
                    CARDAMONE, WALKER, and RAGGI,
                          Circuit Judges.

_____

     Allegheny Energy, Inc. and Allegheny Energy Supply Company,
LLC appeal the judgment entered August 26, 2005 in the United
States District Court for the Southern District of New York
(Baer, J.) awarding Merrill Lynch & Co. Inc., Merrill Lynch &
Capital Services, Inc., and ML IBK Positions, Inc. $158 million
on its contract claim and dismissing appellant's counterclaims.

     Affirmed in part, reversed in part, and remanded.

_____

_____

KATHLEEN M. SULLIVAN, Redwood Shores, California (Daniel H. Bromberg, Daniel A. Zaheer, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Redwood Shores, California; Peter E. Calamari, Sanford I. Weisburst, William B. Adams, Quinn Emanuel Urquhart Oliver & Hedges, LLP, New York, New York, of counsel), for Defendants-Counterclaimants-Appellants.

STUART J. BASKIN, New York, New York (Jeremy G. Epstein, John Gueli, Shearman & Sterling LLP, New York, New York, of counsel), for Plaintiffs-Counter-Defendants-Appellees.

_____

CARDAMONE, Circuit Judge:

Allegheny Energy, Inc. (Allegheny, defendant or appellant) and its wholly-owned subsidiary Allegheny Energy Supply Company, LLC (Supply) appeal from a judgment of the United States District Court for the Southern District of New York (Baer, J.) entered August 26, 2005 awarding Merrill Lynch & Co. Inc., Merrill Lynch & Capital Services, Inc., and ML IBK Positions, Inc. (collectively Merrill Lynch or plaintiff) $158 million on its contract claim against Allegheny and dismissing Allegheny's counterclaims.

The case arises out of Allegheny's acquisition of Global Energy Markets (GEM), an energy commodities trading business owned by Merrill Lynch, for the sum of $490 million plus a two percent interest in Supply. Market conditions spiraled downwards after the fall of Enron in 2001. In 2002 when Allegheny failed to perform its contractual commitment to contribute certain assets to Supply, Merrill Lynch exercised its right to sell back its interest in Supply at an agreed price of $115 million. Litigation ensued when Allegheny questioned the accuracy of Merrill Lynch's representations to it with respect to GEM, and refused to honor Merrill Lynch's right to sell its interest in Supply back to Allegheny.

Some facts critical to the sale of GEM were peculiarly within the knowledge of Merrill Lynch and not disclosed by it to Allegheny. The lack of that information may have played a part in defendant's decision to purchase GEM. But, not knowing the

2

undisclosed facts means Allegheny could not accurately assess its decision. As Alexander Pope succinctly said "What can we reason, but from what we know?" Alexander Pope, An Essay on Man: Epistle I -- Of the Nature and State of Man with Respect to the Universe, in 40 The Harvard Classics, 418 (Charles W. Eliot ed., 1910). For that reason this judgment must be reversed in part.

BACKGROUND and FACTS

This litigation involves two business entities that have a significant presence in the American economy. Allegheny is a Pennsylvania-based energy company with more than 5,000 employees. Merrill Lynch is a leading financial management company with offices in 36 countries. Allegheny sought in 2000 to expand Supply, its wholly-owned subsidiary, through the acquisition of an energy commodities trading company. Merrill Lynch, which had until that time acted as Allegheny's financial advisor, offered Allegheny one of its trading desks, Global Energy Markets. Serious negotiations concerning the acquisition of GEM by Allegheny began in September 2000. When Merrill Lynch withdrew as Allegheny's financial advisor, Allegheny retained a new team of sophisticated advisors.

A.  Financial Data on GEM

Merrill Lynch prepared and delivered to Allegheny financial data on GEM's performance and profitability. These financial summaries covered September, October 2000, and January 2001, and included profit and loss calculations on GEM's largest trading asset, the Williams contract. The September and October

3

financial summaries were flawed in two notable respects: The data reflected substantially higher revenues and net income for GEM than was reflected on Merrill Lynch's books and records, and the reports were not prepared by Merrill Lynch's finance department as required by its own internal regulations.

GEM had a contract with Williams Energy Marketing & Trading, a Southern California energy provider, giving GEM options to buy electricity over a period of years. The October financials recognized additional revenues of $32 million attributed to the Williams contract. When defendant discovered an earlier estimate of David Chung, an expert hired by Merrill Lynch to value the Williams contract, that reflected a $10.5 million loss on the contract, defendant challenged the integrity of the process by which Merrill Lynch arrived at the $32 million figure. Nonetheless, the district court credited Merrill Lynch's explanation that Chung's lower valuation was rejected because his methodology was improper under generally accepted accounting principles.

In early January 2001, within days of the scheduled signing, Merrill Lynch realized that the September and October summaries contained significantly different numbers than those reflected on Merrill Lynch's own books. On January 5, 2001 plaintiff corrected at least some of the inaccuracies in the earlier reports, but overstated earnings generated by operations other than the Williams contract. It appears that the non-Williams component of GEM was only of peripheral concern to the parties.

4

The January financials did not reflect $28 million in losses incurred on the Williams contract. Merrill Lynch explained the omission by reference to a company policy under which such losses are reflected at the management level so that traders will not be penalized for unpredictable fluctuations in assets like the Williams contract. The district court found these losses were disclosed to Allegheny in valuation spreadsheets prepared by Chung. When plaintiff's negotiating team delivered the January data it informed Allegheny that the updated report should be substituted for the September and October summaries. Merrill Lynch's partial explanation for the different figures was that the January version reflected certain overhead costs that were disregarded earlier. Allegheny asserts it rejected the new financials and insisted that the deal proceed on the basis of the September and October reports.

It is a significant factor in this litigation that Dan Gordon, GEM's chief executive officer, played a large role in Merrill Lynch's alleged fraud. Gordon has since admitted to knowingly providing Allegheny with inaccurate information in the September and October financials. After the closing of the GEM deal it was learned that Gordon had embezzled $43 million dollars from Merrill Lynch by rigging a fraudulent contract for outage insurance on the Williams contract with a sham company he owned called Falcon Energy Holdings (Falcon). He was later convicted and jailed for his criminal conduct.

5

Although there is no direct evidence that other officers at Merrill Lynch knew of Gordon's embezzlement prior to the closing, the record reveals some of plaintiff's officials were aware Gordon had evaded its internal credit controls to set up the Falcon deal and had lied about the evasion. Plaintiff also knew that Gordon had prepared the flawed September and October financials, but seems to have believed that the inaccuracies were the product of disapproved accounting methods, rather than dishonesty. Merrill Lynch failed to disclose any of these facts to Allegheny.

## B. The Purchase Agreement

After four months of due diligence the parties signed an Asset Contribution and Purchase Agreement (Purchase Agreement or Agreement) on January 8, 2001. Under the Agreement Allegheny acquired GEM paying Merrill Lynch $490 million in cash and giving it a two percent membership interest in Supply. Section 5.15 of the Purchase Agreement provided that if Allegheny failed to contribute certain assets to Supply by September 16, 2002 Merrill Lynch could require Allegheny to repurchase its interest in Supply for $115 million.

Merrill Lynch agreed to several warranties in the Agreement relating to the quality and nature of the information it had provided Allegheny. Section 3.12(b) stated that the Business Selected Data has been prepared in good faith by the management of the business based upon the financial records of the business. The district court found the provision referenced the January

financial data exclusively. In § 3.12(c), which the district court found applicable to all of the disputed financial data, Merrill Lynch represented the "books of account and other financial records of [GEM] (i) are in all material respects true, complete and correct, and do not contain or reflect any material inaccuracies or discrepancies and (ii) have been maintained in accordance with [plaintiff's] business and accounting practices." Plaintiff agreed in § 3.16 that the information it provided to Allegheny "in the aggregate, includes all information known to the Sellers which, in their reasonable judgment exercised in good faith, is appropriate for the Purchasers to evaluate [GEM's] trading positions and trading operations." The parties waived "any and all right to trial by jury in any legal proceeding arising out of or related to" the Purchase Agreement.

## C. Prior Proceedings

In early September 2002 Allegheny reported that it would be unable to contribute to Supply the assets contemplated in the Agreement and Merrill Lynch gave prompt notice of its intention to exercise its put right pursuant to § 5.15. On September 24, 2002 Merrill Lynch filed the instant action against Allegheny in district court, contending Allegheny breached the Agreement by failing to honor Merrill Lynch's put right.

Defendant brought an action against plaintiff in state court the following day and moved to stay the federal proceedings plaintiff had instituted arguing that Supply's presence in the federal litigation would defeat complete diversity as both Supply

7

and Merrill Lynch were Delaware citizens. On May 30, 2003 the district court denied Allegheny's motion for a stay and ordered that Supply, as a necessary party whose absence produced a risk that the parties would be subject to inconsistent obligations, be joined to the action pursuant to Federal Rule of Civil Procedure 19(a). Merrill Lynch & Co. v. Allegheny Energy, Inc., 02 Civ. 7689, 2003 WL 21254420 (S.D.N.Y. May 30, 2003). After classifying Supply as a defendant for jurisdictional purposes, the court concluded that 28 U.S.C. § 1367 authorized its exercise of supplemental jurisdiction over Supply's "downsloping" claims against Merrill Lynch. Id. at *4-5.

Allegheny asserted counterclaims against Merrill Lynch for, inter alia, fraudulent inducement and breach of contract, and requested a jury trial to resolve its fraud counterclaim. Plaintiff moved to dismiss defendant's counterclaims and strike its jury demand. On November 24, 2003 the district court ruled Allegheny had stated viable claims for breach of contract and fraudulent inducement, but found Allegheny's contractual waiver of its right to a jury trial effective vis-à-vis its fraud claim. Merrill Lynch & Co. v. Allegheny Energy, Inc., 382 F. Supp. 2d 411 (S.D.N.Y. 2003).

Both parties moved for summary judgment, with Merrill Lynch arguing that Allegheny breached the Agreement, and Allegheny contending that it had no duty to perform because Merrill Lynch had materially breached its obligations. Reasoning that Merrill Lynch had substantially performed its side of the Agreement, the

8

district court rejected Allegheny's defense and awarded summary judgment to Merrill Lynch on its contractual claim. <u>Merrill Lynch & Co. v. Allegheny Energy, Inc.</u>, 02 Civ. 7689, 2005 WL 832050, at *3 (S.D.N.Y. Apr. 12, 2005).

Following a 13-day bench trial in May 2005, the trial court dismissed Allegheny's breach of warranty and fraud counterclaims and awarded Merrill Lynch $115 million plus interest on its breach of contract claim. <u>Merrill Lynch & Co. v. Allegheny Energy, Inc.</u>, 02 Civ. 7689, 2005 WL 1663265 (S.D.N.Y. Jul. 18, 2005). Final judgment was entered on August 26, 2005. This appeal followed.

DISCUSSION

Appellant raises a number of issues on this appeal that warrant discussion. We analyze, first, a threshold issue challenging the subject matter jurisdiction of the district court; second, dismissal of Allegheny's fraudulent inducement counterclaim; third, dismissal of defendant's breach of warranty counterclaim; fourth, the grant of summary judgment to plaintiff Merrill Lynch; and fifth, the denial of Allegheny's demand for a jury trial. Before we begin analysis of these five issues, we touch briefly on the standard of our review.

We review <u>de novo</u> the district court's disposition of a motion for summary judgment under the same standard applied by the district court. <u>Tocker v. Philip Morris Cos.</u>, 470 F.3d 481, 486-87 (2d Cir. 2006). Following a bench trial, we review the trial court's factual findings for clear error, <u>Concourse Rehab.</u>

9

& Nursing Ctr., Inc. v. DeBuono, 179 F.3d 38, 43 (2d Cir. 1999), while its resolution of legal questions, including jurisdiction and the right to a jury trial, are subject to de novo review. See id.; Brown v. Sandimo Materials, 250 F.3d 120, 125 (2d Cir. 2001).

I   Subject Matter Jurisdiction

Allegheny challenges first the subject matter jurisdiction of the district court because it contends the joinder of Supply, a Delaware citizen as is Merrill Lynch, destroyed complete diversity.  Citing Viacom Int'l, Inc. v. Kearney, 212 F.3d 721 (2d Cir. 2000), the district court exercised supplemental jurisdiction under 28 U.S.C. § 1367 over the claims Supply asserted against Merrill Lynch, and aligned Supply as a defendant with Allegheny for jurisdictional purposes.

A.   The Effect of Exxon on the District Court's Ruling

Appellant does not argue the district court reached the wrong result under Viacom, but insists Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546 (2005), bars jurisdiction when citizens from the same state are found on opposite sides of an action.  Exxon addressed the question whether 28 U.S.C. § 1367 authorizes the exercise of jurisdiction over actions that do not meet the amount-in-controversy requirement in a case where at least one plaintiff's claim satisfies the requirement.  Id. at 558.

The Supreme Court ruled in Exxon that the assertion by a single diverse plaintiff of a claim that satisfies the

10

jurisdictional requirements of 28 U.S.C. § 1332 is a civil action over which a district court may take original jurisdiction. Id. at 559. Once jurisdiction is anchored, § 1367(a) permits the exercise of supplemental jurisdiction over claims asserted by additional diverse plaintiffs, whether or not such claims meet the amount-in-controversy requirement, unless jurisdiction is barred by § 1367(b). Id. at 558-59.

Exxon makes clear that its expansive interpretation of § 1367 does not extend to additional parties whose presence defeats diversity. Id. at 562, 564, 566; see also 13 Charles A. Wright et al., Federal Practice & Procedure § 3523, at 99 n.42.1, 103 (2d ed. 1984 & Supp. 2007). The reason for the different treatment of these two § 1332 requirements is found in their differing purposes. The purpose of the amount-in-controversy requirement, on one hand, is fulfilled by a single claim of sufficient importance to warrant a federal forum and is not negated by additional, smaller claims. A failure of diversity, on the other hand, contaminates the action, so to speak, and takes away any justification for providing a federal forum. See Exxon, 545 U.S. at 562.

It follows that a defect of the latter sort eliminates every claim in the action, including any jurisdictionally proper action that might otherwise have anchored original jurisdiction, and removes the civil action from the purview of § 1367 altogether. Id. at 564 ("[T]he presence in the action of a single plaintiff from the same State as a single defendant deprives the district

11

court of original jurisdiction over the entire action." (emphasis added)). Further, it is clear that a diversity-destroying party joined after the action is underway may catalyze loss of jurisdiction. Id. at 565 ("A nondiverse plaintiff might be omitted intentionally from the original action, but joined later under Rule 19 as a necessary party. The contamination theory described above, if applicable, means this ruse would fail, but Congress may have wanted to make assurance double sure.").

We cannot fault the district court for not anticipating in 2003 the Supreme Court's 2005 opinion in Exxon. Nonetheless, in light of Exxon, the district court's reliance on our assumption in Viacom that original jurisdiction is anchored in the diversity between the original parties and so any subsequent joinder that is not prohibited by § 1367(b) comes within the court's supplemental jurisdiction, see 212 F.3d at 726, was misplaced. It is now apparent that the contamination theory furnishes limitations on joinder in certain circumstances that may well extend beyond the restrictions listed in § 1367(b). Viacom, which came down before Exxon, did not explore these limitations.

The Supreme Court does not define the reach of the contamination theory and does not purport to announce a new standard for assessing diversity defects but instead relies on the Court's consistent construction of the complete diversity rule. Exxon, 545 U.S. at 553, 556, 564. However, even if we read Exxon as preserving certain well-established exceptions to the complete diversity rule, see, e.g., Owen Equip. & Erection

12

Co. v. Kroger, 437 U.S. 365, 377 (1978); see also, e.g., Caterpillar Inc. v. Lewis, 519 U.S. 61, 66 n.1 (1996); In re Olympic Mills Corp., 477 F.3d 1, 11-12 (1st Cir. 2007), Supply's joinder does not fall within any such exception. A leading practice treatise says "parties that are joined under Rules 19 and 20 . . . must independently satisfy the jurisdictional requirements." 13B Wright et al., supra, § 3608, at 454; see also Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 108 (1968) (noting that joinder of non-diverse defendant under Rule 19(a) destroys jurisdiction); Haas v. Jefferson Nat'l Bank of Miami Beach, 442 F.2d 394, 396 (5th Cir. 1971) (same).

B.  Rule 19 Determination; Dismissal of Supply

Under Rule 19 Supply's status as a necessary party -- which neither party disputes -- and our holding that its joinder is not feasible require us to determine whether Supply is in fact indispensable. Fed. R. Civ. P. 19; Viacom, 212 F.3d at 725. We are influenced by the procedural posture in which this case comes to us and obliged to make full use of hindsight in assessing the four factors set out in Rule 19(b). Provident, 390 U.S. at 109-12. At this stage of litigation, Merrill Lynch's interest in preserving a fully litigated judgment may be overborne only by greater contrary considerations than those that would be required at an earlier stage of the litigation. See id. at 112. Allegheny has not pointed to adequate opposing considerations, but simply stated conclusorily in its brief on appeal that Supply, as a party to the Purchase Agreement, was a paradigmatic

13

indispensable party. Further, Allegheny may be deemed to have consented to Supply's characterization as a dispensable party by virtue of its failure to argue before the district court, in connection with its motion to stay federal proceedings, that Supply was indispensable, and its subsequent failure to raise the point sufficiently in its brief on this appeal. See Cuoco v. Moritsugu, 222 F.3d 99, 112 n.4 (2d Cir. 2000).

Moreover, we are persuaded by Merrill Lynch's point that the retroactive absence of Supply -- defendant's wholly-owned subsidiary -- is not prejudicial to Supply, defendant or plaintiff. See Fed. R. Civ. P. 19(b) (factors one & two); Extra Equipamentos e Exportação Ltda. v. Case Corp., 361 F.3d 359, 364 (7th Cir. 2004) ("[W]e have great difficulty seeing how a 100 percent subsidiary could ever be an indispensable party . . . ."). Given our emphasis on considerations of finality, efficiency, and economy on review of a fully tried case, SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 337 (2d Cir. 2004), we also think Supply's (retroactive) absence does not render its judgment inadequate. See Fed. R. Civ. P. 19(b) (factor three); Provident, 390 U.S. at 110-11. We have already commented on plaintiff's interest in preserving the judgment. See Fed. R. Civ. P. 19(b) (factor four).

## C. Dismissal of Supply

We exercise our authority under Federal Rule of Civil Procedure 21 to cure, ex post, the above-noted jurisdictional defect by dismissing Supply, a dispensable jurisdictional

14

spoiler. See SCS Commc'ns, 360 F.3d at 335; see also Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 832-38 (1989). Allegheny's sole objection to Supply's dismissal, that Merrill Lynch sought a tactical advantage by filing in federal court without joining Supply, is meritless. Newman-Green did alert us to the possibility that the presence of the party subject to dismissal may have produced a tactical advantage to another party, id. at 838, but defendant seems to argue something else entirely, to wit, that Merrill Lynch sought to benefit from Supply's absence from the action.

II  Appellant's Fraudulent Inducement Counterclaim

Allegheny's fraud claim is based on Merrill Lynch's misrepresentations concerning GEM's finances and its failure to disclose the circumstances surrounding the preparation of the flawed September and October financials and Gordon's evasion of Merrill Lynch's credit controls. The district court dismissed the claim on the grounds that defendant: (A) failed to show it justifiably relied on plaintiff's misrepresentations; and (B) failed to prove that its injury was proximately caused by them. Merrill Lynch asserts on appeal that Allegheny should not be permitted to pursue its fraudulent inducement claim because (C) it is duplicative of defendant's breach of warranty claim.

We analyze these grounds in a moment. First we discuss proof of fraud in New York. In New York a plaintiff alleging fraud must show by clear and convincing evidence that the defendant knowingly or recklessly misrepresented a material fact,

15

intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result. See, e.g., Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006); Jo Ann Homes at Bellmore, Inc. v. Dworetz, 25 NY2d 112, 119 (1969). Where a defendant, as here, seeks to show fraud by omission, it must prove additionally that the plaintiff had a duty to disclose the concealed fact. Congress Fin. Corp. v. John Morrell & Co., 790 F. Supp. 459, 472 (S.D.N.Y. 1992).

## A. Justifiable Reliance and Due Diligence

New York courts are generally skeptical of claims of reliance asserted by "sophisticated businessmen engaged in major transactions [who] enjoy access to critical information but fail to take advantage of that access." Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984). Both parties before us are sophisticated business entities that are held to a high standard of conduct in the events leading up to the sale and purchase of GEM.

The district court found that because Allegheny could have discovered the truths that Merrill Lynch obscured or omitted had it pursued its due diligence "with a little more pizzazz," its fraud counterclaim failed to satisfy the justifiable reliance prong. It charged Allegheny with the means and responsibility to discover, for example, Gordon's embezzlement, notwithstanding Merrill Lynch's claim that its own officials were unaware of the embezzlement until after the sale of GEM.

16

In assessing whether defendant met its burden in showing justifiable reliance, we look to a number of factors including the content of its agreement with plaintiff. See Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc., 343 F.3d 189, 195-96 (2d Cir. 2003); Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1543 (2d Cir. 1997) (noting significance of protective language in contract). The warranties contained in §§ 3.12(b), 3.12(c) and 3.16 imposed a duty on Merrill Lynch to provide accurate and adequate facts and entitled Allegheny to rely on them without further investigation or sleuthing. See Metropolitan Coal Co. v. Howard, 155 F.2d 780, 784 (2d Cir. 1946) (L. Hand, J.) ("A warranty . . . . is intended precisely to relieve the promisee of any duty to ascertain the fact for himself."). Further, as Judge Friendly instructs, New York authority follows a two-tier standard in assessing the duty of the party claiming fraud, according to whether the misrepresentations relate to matters peculiarly within the other party's knowledge. If so, the wronged party may rely on them without further investigation. See Mallis v. Bankers Trust Co., 615 F.2d 68, 80-81 (2d Cir. 1980). Merrill Lynch's warranties in effect represent contractual stipulations that the facts covered by them be treated as information exclusively within Merrill Lynch's knowledge.

While the district court wrongly held defendant to too stringent a standard of reliance, Allegheny may not satisfy its burden simply by pointing to the warranties because, for purposes

17

of showing fraud, a party cannot demonstrate justifiable reliance on representations it knew were false, see Banque Franco-Hellenique de Commerce v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997) (noting that plaintiff cannot show it justifiably relied on statements it had reason to know were false).  Thus, on remand Allegheny must offer proof that its reliance on the alleged misrepresentations was not so utterly unreasonable, foolish or knowingly blind as to compel the conclusion that whatever injury it suffered was its own responsibility.  See W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 108, at 750 (5th ed. 1984); see also Christophides, 106 F.3d at 26-27.

Appellant's asserted reliance on the September and October financials despite its receipt of a different financial report appears at first blush to evince the sort of recklessness or knowing blindness that raises doubt about its reliance.  But the apparent malleability of GEM's financial figures to accommodate reserve calculations and sundry accounting concepts tempers any initial skepticism.  We note, for example, that the district court did not find any foul play in Merrill Lynch's exposition of the Williams profit and loss estimates notwithstanding defendant's evidence that the final figure was $40 million (or four times) higher than an early estimate produced by a valuation expert at Merrill Lynch.  It may be that Allegheny was not reckless in believing the earlier figures -- qualified by whatever accounting choices underlay them -- were defensible. Such an argument could find support in defendant's assertion that

18

plaintiff, by concealing the circumstances surrounding the preparation and delivery of the earlier financial summaries, failed in its duty candidly to alert defendant to the risk that the earlier financials were flat-out wrong.

We recognize that Dan Gordon, the author of those inflated financials, committed crimes against Merrill Lynch, his employer. Yet, insofar as Gordon's crimes injured both plaintiff and defendant, we think as between the two parties the responsibility and risks must be borne by plaintiff, Gordon's employer. Further, Merrill Lynch failed to reveal to Allegheny what it did know about Gordon, its principal officer at GEM. Although required by credit controls to obtain prior approval from plaintiff's credit department before trading with new partners, Gordon consummated the Falcon transaction without obtaining such approval. Merrill Lynch discovered the violation of its credit control policy and Gordon's lying about his insurance scam in early September 2000. But plaintiff did not disclose these facts to Allegheny. Instead, plaintiff assured defendant that GEM's principal officer, Dan Gordon, was a person of integrity.

## B. Proximate Cause

In assessing the viability of Allegheny's fraud and contract claims, the district court relied heavily on federal cases that were focused primarily on securities fraud claims. See, e.g., Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005) (addressing fraud claims based on federal securities statutes and implementing regulations); Lentell v. Merrill Lynch & Co., 396

19

F.3d 161 (2d Cir. 2005) (same). Following this line of precedent, the trial court held that GEM's positive performance in the year following the sale, together with the lack of any causal link between GEM's ultimate failure and Merrill Lynch's misrepresentations, precluded Allegheny's fraud claim.

The concept of loss causation elucidated in Dura is closely related to the common law doctrine of proximate cause. 544 U.S. at 343-44; Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992). Dura culls from the common law the black letter law that a fraud plaintiff must show that he acted on the basis of the fraud and suffered pecuniary loss as a result of so acting. 544 U.S. at 343-44. Without doubt, these principles govern defendant's fraud claim, but Dura's conclusion that overpayment alone cannot prove loss causation, as the district court incorrectly believed, is based on the tailored application of these principles set out by the Supreme Court in the securities context. Such application does not govern here.

Instead, we look to New York law that follows the well-established common law rule that fraud damages represent the difference between the purchase price of the asset and its true value, plus interest, generally measured as of the date of sale. McGuire v. Russell Miller, Inc. of N.Y., 1 F.3d 1306, 1310 (2d Cir. 1993); Hanlon v. MacFadden Publ'ns, Inc., 302 N.Y. 502, 511 (1951); cf. Hotaling v. A.B. Leach & Co., 247 N.Y. 84, 87-88 (1928) (explaining that this rule reflects notion that seller's

20

fraud is complete at time of sale and subsequent events do not increase or diminish liability).

In Dura the Supreme Court explained that a mere disparity between the purchase price plaintiffs paid for their shares of common stock and the shares' true value at the time of purchase is insufficient to prove loss causation. 544 U.S. at 342, 347. Dura's bar on recovery based on overpayment alone represents an easily explained departure from common law guidelines on computing damages. The Supreme Court explained that the inflated purchase payment made for a misrepresented stock is "offset by ownership of a share that at that instant possesses equivalent value." Id. at 342. Further, in securities cases there is a presumption that shares are purchased for the purpose of investment and their true value to the investor is the price at which they may later be sold.

Allegheny's fraud claim, by contrast, involves the sale of a business, and under the terms of the Purchase Agreement between the parties New York -- not federal -- law governs its construction and approach to damages. In agreeing on GEM's purchase price, we assume the parties placed value on its intrinsic qualities, including its key personnel and its financial performance. If appellant proves Merrill Lynch fraudulently misrepresented those qualities, it may show that it has acquired an asset at a price that exceeded its true value. If the district court finds Allegheny's fraud claim otherwise valid, damages should be awarded Allegheny to the extent that the

21

purchase price overstated GEM's value on the date of sale as a result of Merrill Lynch's misrepresentations and omissions. Such damages, if any, are considered general, not consequential, damages.

C. Fraud Counterclaim Not Duplicative of Warranty Counterclaim

In Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996), we observed that under New York law, parallel fraud and contract claims may be brought if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages. New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement. See Stewart v. Jackson & Nash, 976 F.2d 86, 88-89 (2d Cir. 1992). Hence, a claim based on fraudulent inducement of a contract is separate and distinct from a breach of contract claim under New York law. Id.; see also RKB Enters., Inc. v. Ernst & Young, 582 N.Y.S.2d 814, 816 (3d Dep't 1992) ("A party fraudulently induced to enter into a contract may join a cause of action for fraud with one for breach of the same contract.").

Defendant's allegations in this case involve misstatements and omissions of present facts, not contractual promises

22

regarding prospective performance. "[A] misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty." First Bank of the Americas v. Motor Car Funding, Inc., 690 N.Y.S.2d 17, 21 (1st Dep't 1999); see also Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc., 68 NY2d 954, 956 (1986).

That the alleged misrepresentations would represent, if proven, a breach of the contractual warranties as well does not alter the result. A plaintiff may elect to sue in fraud on the basis of misrepresentations that breach express warranties. Such cause of action enjoys a longstanding pedigree in New York. See Ward v. Wiman, 17 Wend. 193 (1837). As to the duplication charge, the New York Court of Appeals has allowed a fraud claim to proceed in tandem with a contract claim where the seller misrepresented facts as to the present condition of his property, even though these facts were warranted in the parties' contract. Jo Ann Homes, 25 NY2d at 119-20 (holding without discussion on duplication); cf. Deerfield, 68 NY2d at 956 (holding oral representation formed proper basis for contract and fraud charge). The Appellate Division has provided a convincing rationale: "A warranty is not a promise of performance, but a statement of present fact." First Bank, 690 N.Y.S.2d at 21.

III   Allegheny's Breach of Warranty Counterclaim

Appellant contends the misrepresentations and omissions discussed above breached §§ 3.12(b), 3.12(c) and 3.16 of the

23

Purchase Agreement. The district court did not exonerate Merrill Lynch of all alleged breaches, but dismissed appellant's contract claim because it had failed to prove that any breach had proximately caused its injury or to prove reasonably ascertainable damages.

## A. Causation and Damages

Here too, the district court turned to federal cases addressing securities fraud, discussed above, to hold defendant was required to show Merrill Lynch's misrepresentations caused actual loss. As noted, actual loss cannot be shown in the securities context by mere allegation that a plaintiff purchased shares at a price that exceeded their true value. Dura, 544 U.S. at 342. Our conclusion above that these cases do not govern Allegheny's fraud counterclaim applies a fortiori to its breach of warranty counterclaims.

Under New York law, an express warranty is part and parcel of the contract containing it and an action for its breach is grounded in contract. See CBS, Inc. v. Ziff-Davis Publ'g Co., 75 NY2d 496, 503 (1990). A party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms. Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 384 (2d Cir. 2006). It follows that appellant is entitled to the benefit of its bargain, measured as the difference between the value of GEM as warranted by Merrill Lynch and its true value at the time of the transaction. See Bennett v. U.S. Trust Co. of N.Y., 770 F.2d

24

308, 316 (2d Cir. 1985); <u>Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.</u>, 453 N.Y.S.2d 750, 756 (2d Dep't 1982).

It is a well established principle that contract damages are measured at the time of the breach. <u>Sharma v. Skaarup Ship Mgmt. Corp.</u>, 916 F.2d 820, 825 (2d Cir. 1990) (collecting cases); <u>Simon v. Electrospace Corp.</u>, 28 NY2d 136, 145 (1971). The district court's inquiry into GEM's performance and market conditions in the months following the acquisition was improper because events subsequent to the breach, viewed in hindsight, may neither offset nor enhance Allegheny's general damages. See <u>Sharma</u>, 916 F.2d at 826.

Our review of the district court's pertinent findings allows us to dispose with confidence of only one of appellant's allegations. The trial court's determination that § 3.12(b) only applied to the January financials, coupled with its finding that this latter set of data was prepared in good faith and was basically accurate, renders reconsideration on remand of the alleged breach of this warranty unnecessary.

By contrast, defendant's claims relating to §§ 3.12(c) and 3.16 require further consideration by the district court through the lens of the proper legal standard. The trial court found that Merrill Lynch had breached "at least some" warranties and that § 3.12(c) was materially breached by the September and October financials. Its conclusions with respect to § 3.16 are insufficient to determine whether it found plaintiff breached the warranty or whether any such breach resulted in a diminution in

25

the objective value of GEM at the time of the sale. For example, the district court's finding that Merrill Lynch did not deny access to Allegheny during due diligence is not tantamount to finding that Merrill Lynch met its contractual obligation under § 3.16 to "provide" certain information to Allegheny. Moreover, the trial judge reached no conclusion with regard to whether plaintiff's failure to disclose Gordon's evasion of its in-house credit controls and to alert defendant to the circumstances underlying the preparation of the September and October financials constituted a breach of this warranty. For correction of the above recited errors, we must remand.

On remand the difference between the value of GEM as warranted and its value as delivered should be calculated. GEM's value as delivered should reflect any deductions from its purchase price necessary to reflect the broken warranties. In other words, the district court should determine how GEM would have been valued by knowledgeable investors at the time of the sale were such investors aware of any breaches proved by Allegheny. As any such damages are general rather than consequential, Allegheny is required to show with reasonable certainty the fact of damage, not its amount. See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 110 (2d Cir. 2007).

### B. Reliance on Express Warranties

The district court was of the view that Allegheny would not have insisted on a lower price had it known all the facts and

26

appears to have inferred from this finding that Allegheny did not rely on Merrill Lynch's representations in agreeing to close the deal at the agreed upon price. The trial court's reasoning was flawed. It incorrectly used the standard for reliance on express warranties applicable to contract claims. The dispositive question is whether defendant would have insisted on a lower price had it not believed it was purchasing plaintiff's promise to compensate it for any injury caused by the falsity of the warranted facts. See Metropolitan Coal, 155 F.2d at 784 (defining warranty as "a promise to indemnify promisee for any loss if the fact warranted proves untrue"); CBS, 75 NY2d at 504.

In contrast to the reliance required to make out a claim for fraud, the general rule is that a buyer may enforce an express warranty even if it had reason to know that the warranted facts were untrue. Rogath v. Siebenmann, 129 F.3d 261, 265 (2d Cir. 1997) (stating that buyer with knowledge of falsity of warranted facts may purchase seller's warranty as insurance against future claims); Vigortone AG Prods., Inc. v. PM AG Prods., Inc., 316 F.3d 641, 648 (7th Cir. 2002). This rule is subject to an important condition. The plaintiff must show that it believed that it was purchasing seller's promise regarding the truth of the warranted facts. Rogath, 129 F.3d at 265. We have held that where the seller has disclosed at the outset facts that would constitute a breach of warranty, that is to say, the inaccuracy of certain warranties, and the buyer closes with full knowledge and acceptance of those inaccuracies, the buyer cannot later be

27

said to believe he was purchasing the seller's promise respecting the truth of the warranties. Id. Here, if the district court finds that Merrill Lynch candidly disclosed that the September and October financials were wrongly inflated and therefore inaccurate, Allegheny cannot prevail on its claim that Merrill Lynch breached § 3.12(c).

IV  Summary Judgment Reversed

In April 2005, the district court granted summary judgment to Merrill Lynch on its contract claim and rejected Allegheny's defense that Merrill Lynch's breach of various warranties excused Allegheny from further performance under the Purchase Agreement. The court reasoned that plaintiff had substantially performed inasmuch as it had no further performance pending, i.e., having delivered GEM, there was no further action that Merrill Lynch was required to take under the Purchase Agreement. Further, the summary judgment order suggested that allegations of breach of warranty were insufficient, categorically, to excuse the injured party's performance under a contract. The court also found Allegheny had obtained the primary intended benefit under the contract through its two-year ownership of GEM.

Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach. See Hadden v. Consol. Edison Co. of N.Y., 34 NY2d 88, 96 (1974) (assessing substantial performance on basis of several factors, such as the absolute and

28

relative magnitude of default, its effect on the contract's purpose, willfulness, and degree to which injured party has benefitted under contract). The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain. Anderson Clayton & Co. v. Alanthus Corp., 457 N.Y.S.2d 578 (2d Dep't 1983).

The legal arguments relied on by the district court and the inferences it drew were insufficient to hold that Merrill Lynch substantially performed under the Purchase Agreement at the summary judgment stage. We agree with appellants that there is no reason under New York law to treat a breach of warranty any differently than any other contractual breach. See CBS, 75 NY2d at 503. It follows that if Merrill Lynch breached one or more warranties and the cumulative effect of such breaches was material, it did not substantially perform its side of the deal. Further, while we do not dispute that Merrill Lynch's delivery and Allegheny's two-year ownership of GEM represented advanced performance of the contract in a chronological sense, the trial court was required to address appellant's argument that GEM turned out to be substantially different from what the parties had bargained for, thereby "defeat[ing] the object of the parties in making the contract," Frank Felix Assocs. v. Austin Drugs, Inc., 111 F.3d 284, 289 (2d Cir. 1997). See Richard A. Lord, Williston on Contracts § 63:3, at 438-39 (4th ed. 2002). Such a

29

claim, if proved, would excuse defendant's non-performance under the Purchase Agreement.

Appellees contend that the district court's eventual factual findings amply support its prior summary judgment ruling. See generally Kerman v. City of New York, 261 F.3d 229, 235 n.3 (2d Cir. 2001) (considering entire record in reviewing summary judgment). Although Allegheny might have argued that we should stand in the shoes of the district court at the time of summary judgment to assess the propriety of its disposition, see U.S. E. Telecomms., Inc. v. U.S. W. Commc'n Servs., Inc., 38 F.3d 1289, 1301 (2d Cir. 1994) ("Our review is confined to an examination of the materials before the trial court at the time the ruling was made, and neither the evidence offered subsequently at trial nor the verdict is relevant."), it waived this argument by relying on later-developed portions of the record (including the district court's findings) to support its challenge to summary judgment on appeal. Kerman, supra, which was decided in 2001, did not acknowledge U.S. E. Telecomms., supra, decided in 1994.

Thus, we have considered whether the district court's finding that the January financials were mostly accurate and its statement that "everyone wanted this deal to go through and either understood or did not care about the changed financial statements" are dispositive on the issue of materiality. Having considered these findings, we conclude the district court's flawed summary judgment cannot be affirmed on the basis of such partial findings. We note that Allegheny has alleged breach of

30

warranty on the basis of material omissions as well as misrepresentations. Allegheny's attitude prior to signing and its nonchalant response to information it possessed at that time has no bearing on the materiality of information that was withheld by Merrill Lynch. More generally, the district court has not provided us with an adequate assessment of the pertinent factors to determine whether the broken warranties amounted to a material breach. See Hadden, 34 NY2d at 96. Accordingly, we must reverse the district court's April 2005 grant of summary judgment to Merrill Lynch.

V  Allegheny's Jury Demand

Under § 11.09(b) of the Purchase Agreement, Allegheny irrevocably waived any right to a jury trial in a proceeding arising out of the Purchase Agreement. According to Allegheny the waiver does not apply to its fraudulent inducement claim. The district court agreed with Merrill Lynch that a jury waiver applies to a claim for fraudulent inducement where it is not alleged that the waiver provision itself was procured by fraud.

When asserted in federal court, the right to a jury trial is governed by federal law. McGuire, 1 F.3d at 1313; see also Med. Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 18 (1st Cir. 2002) (applying federal law to decide enforceability of jury waiver). Although the right is fundamental and a presumption exists against its waiver, a contractual waiver is enforceable if it is made knowingly, intentionally, and voluntarily. Nat'l Equip. Rental, Ltd. v. Hendrix, 565 F.2d 255, 258 (2d Cir. 1977).

31

Whether a contractual waiver is effective against a claim that the contract containing the waiver was induced by fraud is a question of first impression in this Circuit, and federal precedent on the topic is thin.  We join the Tenth Circuit in holding that unless a party alleges that its agreement to waive its right to a jury trial was itself induced by fraud, the party's contractual waiver is enforceable vis-à-vis an allegation of fraudulent inducement relating to the contract as a whole. See Telum, Inc. v. E.F. Hutton Credit Corp., 859 F.2d 835, 837-38 (10th Cir. 1988).

Telum drew an analogy to the arbitration context, in which the Supreme Court has held that an agreement to arbitrate is effective with respect to claims of fraudulent inducement that relate to the contract generally, but not to the agreement to arbitrate specifically.  Id. at 837.  Although we do not disagree with appellant that the arbitration cases rely on a federal statutory scheme favoring arbitrability that runs contrary to the presumption against waiver applicable here, we think the analogy persuasive as a matter of logic.

A promise to bring proceedings before a judge, not a jury, is akin to an agreement to arbitrate in that both express the parties' consent as to how to handle differences that may arise. Indeed, arbitration represents a more dramatic departure from the judicial forum than does a bench trial from a jury trial.  Id. at 838.  If one litigant alleges that an agreement's dispute resolution provision itself was procured by fraud, the fairest

32

course is to afford that litigant the protections he would have enjoyed had he never been fraudulently induced to forsake them by contract. If, on the contrary, the litigant does not challenge the provision as being the product of fraud, we see no reason to replace the agreed upon mode of dispute resolution with another.

Further, as we expressed in the arbitration context, we are concerned that deciding this issue in favor of appellant makes it too easy for a litigant to avoid its contractual promise to submit a case to a judge by alleging fraud. See, e.g., El Hoss Eng'g & Transp. Co. v. Am. Indep. Oil Co., 289 F.2d 346, 349 (2d Cir. 1961) (discussing problems posed by fraud in the inducement claims including sham litigations pursued to avoid arbitration).

CONCLUSION

For the foregoing reasons, we (1) order the dismissal of Supply; (2) reverse the award of summary judgment to Merrill Lynch on its breach of contract claim; (3) reverse the dismissal of Allegheny's counterclaim for fraudulent inducement; (4) reverse the dismissal of Allegheny's counterclaim for breach of warranty as to §§ 3.12(c) and 3.16 of the Agreement; and (5) affirm the denial of appellant's jury demand. The case is remanded to the district court for further proceedings consistent with this opinion.

33