**KOCH INDUSTRIES, INC., KoSa B.V., Arteva Specialties, S.A.R.L., and Arteva Services, S.A.R.L., Plaintiffs,**

v.

**Hoechst AKTIENGESELLSCHAFT, Celanese Aktiengesellschaft, CNA Holdings, Inc., and Celanese America's Corporation, Defendants.**

No. 03 Civ. 8679 (NRB).

United States District Court,
S.D. New York.

July 19, 2010.

**202**

Kenneth Conboy, Esq., Catherine E. Palmer, Esq., Blair G. Connelly, Esq., Latham & Watkins LLP, New York, NY, for Plaintiffs.

Hector Torres, Esq., Harold G. Levison, Esq., David E. Ross, Esq., Zachary W. Mazin, Esq., Kasowitz, Benson, Torres & Friedman LLP, Thomas P. Lynch, Esq., Lynch Rowin LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiffs Koch Industries, Inc. ("Koch"), KoSa B.V.[1] ("KoSa"), Arteva Specialties, S.á.r.l.[2] ("Arteva Specialties"), and Arteva Services, S.á.r.l. ("Arteva Services" and collectively "plaintiffs" or the "Koch Group") bring this action against defendants Hoechst Aktiengesellschaft ("Hoechst"), Celanese Aktiengesellschaft ("Celanese"), CNA Holdings, Inc. ("CNA"), and Celanese Americas Corporation[3] ("CAC" and collectively "defendants" or the "Hoechst Group"), alleging that when defendants sold plaintiffs a polyester manufacturing business in 1998, defendants fraudulently concealed that the business was violating antitrust laws. Plaintiffs assert New York state law claims of fraud, fraudulent misrepresentation, fraudulent concealment and unjust enrichment, and they seek indemnification pursuant to the Asset Purchase Agreement ("APA") that governed the sale.

Presently before the Court are the parties' cross-motions for summary judgment, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs have moved for partial summary judgment on the issue of defendants' liability, under the indemnity provision of the APA, for plaintiffs' costs and expenses in defending and settling numerous third party civil antitrust suits. Defendants have moved for summary judgment on all counts. For the reasons stated herein, defendants' motion is granted in part and denied in part, and plaintiffs' motion is granted.

## FACTUAL AND PROCEDURAL BACKGROUND[4]

### A. The Purchase of the Polyester Business

In October 1997 Koch and its joint venture partner, IMASAB S.A. de C.V. ("IMASAB"), entered into discussions with the Hoechst Group about a potential acquisition of the Hoechst Group's polyester manufacturing business (the "Polyester Business"). PSF ¶ 6. One of the Hoechst

---

1. KoSa B.V. is now known as INVISTA B.V., and was formerly known as Arteva B.V. Unless otherwise noted, we refer to all entities as they were named on the date this action was filed, November 3, 2003.

2. Arteva Specialties, S.á.r.l. is now known as INVISTA S.á.r.l.

3. Celanese Americas Corporation was formerly known as Hoechst Celanese Corporation.

4. Unless otherwise noted, the following facts, which are derived principally from the Local Rule 56.1 statements of uncontested material facts of defendants ("DSF") and plaintiffs ("PSF"), and the affidavits and exhibits attached thereto ("Nysenbaum Decl."; "Connelly Decl."; "Mazin Decl."), are undisputed. We also note certain facts disputed by the parties, derived principally from defendants' response to PSF, plaintiffs' response to DSF, and plaintiffs' counter statement of facts ("Pls. CSF").

Group's business lines that Koch contemplated purchasing manufactured polyester staple fiber, a man-made synthetic fiber that has numerous end uses. PSF ¶¶ 10–12. Koch conducted due diligence into the Polyester Business and communicated with a number of executives at the Hoechst Group, including Grover Smith, CAC's Vice President and General Manager of Polyester Staple, and Tom Nixon, CAC's Sales and Marketing Director. PSF ¶¶ 14–16.

As part of the due diligence process, Koch representatives attended a meeting at the Hoechst Group concerning the polyester staple business line. PSF ¶ 18. Smith, Nixon and other Hoechst Group representatives gave a PowerPoint presentation that mentioned the Polyester Business's strategy "to maintain high capacity utilization through strengths in customer relationships, product service, consistency, and technology along with continued emphasis on cost reduction and spending levels." PSF ¶ 19. On May 29, 2008, Koch sent the Hoechst Group a list of questions about the Polyester Business; one question asked whether there "[h]ave been any instances of material non-compliance with laws or regulations (potential or actual fines and penalties in excess of U.S. $100,000)." PSF SI 21. The Hoechst Group replied that there were no such instances of material non-compliance. PSF ¶ 22.

Once the parties had agreed in principle to the transaction, Koch and IMASAB formed a joint venture, KoSa, which was to operate as an acquisition vehicle.[5] PSF ¶ 5; DSF ¶ 61. KoSa had two operating subsidiaries, Arteva Specialties and Arteva Services. *Id.* On October 12, 1998, Hoechst and KoSa entered into the APA, which contained the terms of the proposed acquisition. Decl. of Blair G. Connelly in Supp. of Pls. Opp'n to Defs. Motion for Summary Judgment ("Connelly Opp'n Decl."), Ex. 15 (the APA). On December 10, 1998, Hoechst and KoSa closed the acquisition for $1.53 billion pursuant to the APA (the "Closing"). PSF ¶ 28. Hoechst also executed a Bill of Sale that transferred the Polyester Business to Arteva Specialties "for and in consideration of US$463,789,000 ... constituting a portion of the Purchase Price [as defined in the APA]." DSF ¶ 67; Decl. of Zachary W. Mazin in Supp. of Defs. Motion for Summary Judgment, Ex. 38 (the "Bill of Sale") § 2.1.

## B. The Asset Purchase Agreement ("APA")

Under the APA, defendants agreed to indemnify plaintiffs for losses associated with the conduct of the polyester business prior to the Closing. Specifically, Section 2.4 of the APA requires Hoechst to pay all "Retained Liabilities" and provides that the "Buyer [Kosa] shall not assume or become liable for any obligations, liabilities or indebtedness of any member of the Seller Group, and ... the members of the Seller Group shall retain all of their respective liabilities, other than the Assumed Liabilities, whether or not relating to the ownership or operation of the Polyester Business." Section 17.2(a)(i) of the APA requires Hoechst "to defend, indemnify and hold harmless the Buyer Indemnified Parties from and against ... [a]ny and all Losses resulting from or in connection with, directly or indirectly, the failure of Seller and its Affiliates to pay, perform and discharge when due all Retained Liabilities." These provisions are given meaning by the following defined terms:

> "For the sake of clarity, ... Retained Liabilities include all liabilities and obligations resulting from or in connection with, directly or indirectly. the conduct of the Polyester Business ... prior to or as of the Closing." APA § 2.4.

5. In 2001, Koch bought out IMASAB and became the 100% owner of KoSa. PSF ¶ 5.

"Assumed Liabilities [include] all liabilities or obligations resulting from or in connection with, directly or indirectly ... the conduct of the Polyester Business ... after the Closing." APA § 2.3(a).

"Buyer Indemnified Parties" are "Buyer [KoSa] and its Affiliates and their respective officers, Directors, employees [etc.]." APA § 12.1(a).

"Affiliate" is "any other Person at such time directly or indirectly controlling, controlled by or under common control with, such Person." APA § 1.1.

"Losses" include "any and all direct losses, damages, liabilities, judgments, payments, obligations, penalties, fines, assessments, deficiencies, liens, costs, expenses and fees (including ... fees of counsel ... and expert witnesses, costs of investigation and preparation of any kind or nature whatsoever, interest charges and commercially reasonable mitigation costs) and Consequential Losses." APA § 1.1.

"Consequential Losses" are "any and all consequential losses or damages (including business interruptions and loss of profits)." APA § 1.1.

Defendants also represented and warranted that the Polyester Business had no undisclosed liabilities, that it was in compliance with all applicable laws, and that the transaction documents contained no material misstatements or omissions.[6] APA §§ 7.9(b), 7.12(a), 7.29. Section 17.2(a)(ii) requires Hoechst to indemnify the "Buyer Indemnified Parties" for "any and all Losses" resulting from the breach of any representation or warranty in the agreement. The statute of limitations for any claim for breach of Hoechst's representations and warranties was set at thirty months from the Closing date. APA § 17.1(a). This statute of limitations would be tolled from the date that an indemnified party submits a "Claim Notice" (as defined below). APA § 17.1(b).

The APA also provides a procedure by which plaintiffs can obtain indemnity from defendants. Specifically, Section 17.4(a)(i) of the APA requires:

"In the event that any Claim for which an Indemnifying Party would be liable to an Indemnified Party is asserted against ... such Indemnified Party by a third party (a 'Third Party Claim'), ... the Indemnified Party shall with reasonable promptness notify in writing the Indemnifying Party of such Claim, specifying the nature of and the specific basis for such Claim and the amount or the estimated amount thereof to the extent then feasible to determine (which estimate shall not be conclusive of the final amount of such claim) (a "Claim Notice"); *provided, however,* that any failure to give such notice shall not constitute a waiver of any rights of the Indemnified Party except to the extent the rights of the Indemnifying Party are actually prejudiced as a result of the delay or lack of detail." [7]

When a Third Party Claim has been asserted, the Indemnifying party is permit-

---

**6.** Additionally, Hoechst covenanted to operate the Polyester Business in compliance with all applicable laws from the date of execution of the APA to the Closing date, and to notify KoSa of any information that would result in a breach of any representation or warranty. APA §§ 9.1, 9.7.

**7.** The APA defines "Claim" to include "any demand, demand letter, claim, counterclaim, cause of action, or notice of noncompliance, notice of violation or notice of right to contribution, indemnification or other remedy, in each case made in writing, or any Proceeding." APA § 1.1. "Proceeding" means "any action, suit, arbitration, claim, inspection, investigation, notice, review or other judicial, administrative or other proceeding, at law or equity, before any Authority." *Id.*

ted to take over the defense of the Third Party Claim, and to retain appropriate counsel. APA § 17.4(a)(ii). Alternatively, the Indemnified Party is permitted to force the Indemnifying Party to take over the defense and retain defense counsel. *Id.* The APA also provides that "[n]o Indemnifying Party shall be liable to an Indemnified Party for any settlement of any Third Party Claim without the consent of the Indemnifying Party." *Id.*

The parties agreed that, except for the representations and warranties set forth in the APA, the Hoechst Group was selling the Polyester Business "AS IS, WHERE IS" and that the Hoechst Group did not make "ANY OTHER REPRESENTA-TIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED ..., ALL OF WHICH ARE HEREBY EXPRESSLY EXCLUDED AND DISCLAIMED." APA § 7.29 (emphasis in original). The APA also contains a merger clause[8] and a limited remedies provision, which states that "monetary indemnification specifically provided by this Agreement shall be exclusive of any other rights to monetary indemnification or monetary damages to which a Party may be entitled under any statute, contract, or otherwise or at law or in equity." APA § 19.10.

The APA is governed by New York law. APA § 19.18.

### C. The Polyester Business After the Closing

Following the Closing on December 10, 1998, the Polyester Business continued operations under the control of KoSa and its subsidiaries, Arteva Specialties and Arteva Services. PSF ¶ 57. Certain employees who were previously employed by the Hoechst Group were hired by KoSa, including Tom Nixon who accepted a senior sales position at the new company.[9] PSF ¶¶ 58, 60; DSF ¶ 72. Another employee who transferred with the Polyester Business was Troy Stanley, who had been at the Hoechst Group since 1989. PSF ¶ 59. Prior to the Closing, Stanley was CAC's Polyester Staple Manager for Apparel and Home Fashions and he reported to Nixon. PSF ¶ 59; DSF ¶ 11. Approximately four months after Nixon and Stanley moved to KoSa, Nixon was terminated and Stanley was promoted to the position of Arteva Specialties' Business Director for Textile Staples for the U.S. and Canada. DSF ¶ 12; Defs. Response to PSF ¶¶ 59–60.

During the year 2000, the U.S. Department of Justice Antitrust Division ("DOJ") began to investigate potential anticompetitive activity in the polyester staple industry. PSF ¶¶ 62, 66. As part of that investigation, the DOJ and FBI contacted a business manager for polyester staple at a company that competed with the Polyester Business now owned by KoSa. PSF ¶ 66. In October 2000, that individual recorded a series of conversations with Troy Stanley. PSF ¶ 68. On January 10, 2001, Stanley confessed to participating in a conspiracy to fix polyester staple prices and allocate customers among competitors. PSF ¶ 70. Shortly thereafter, Stanley's immediate employer—Arteva Specialties—received a grand jury subpoena from the DOJ re-

---

**8.** "This Agreement [and the related transaction documents] contain the entire understanding of the Parties with respect to the transaction described in those documents and supersede and cancel any prior agreement with respect to such subject matter, whether written or oral .... There are no promises, obligations or agreements of either Party with respect to the transactions described herein other than those set forth in this Agreement [and the related transaction documents]." APA § 19.7.

**9.** KoSa also offered a position to Grover Smith, but he declined the offer and did not join the new company. PSF ¶ 61; DSF ¶ 73.

questing information about the Polyester Business dating back to January 1995. PSF ¶¶ 71–72.

### D. Third Party Civil Antitrust Suits

On April 2, 2001, following Arteva Specialties' receipt of the DOJ subpoena, the General Counsel for Arteva Specialties sent a letter to Hoechst, with copies to CAC and Celanese. Connelly Opp'n Decl., Ex. 12 (April 2, 2001 letter). The letter described the DOJ investigation and notified Hoechst that "the allegations asserted by the DOJ, if true, may represent Hoechst 'Retained Liabilities' as such term is defined in the [APA]." *Id.* The letter also stated that it was "intended to constitute a claim notice within the meaning of . . . the APA." *Id.*

On April 26, 2001, the General Counsel for CAC responded on behalf of "all three companies to whom the Claim Notice was sent," expressing the Hoechst Group's "written notice of objection and intention to contest the indemnity claim." Connelly Opp'n Decl., Ex. 13 (April 26, 2001 letter). On June 8, 2001, Arteva Specialties sent the Hoechst Group a follow-up letter stating Arteva Specialties' intention to cooperate with the DOJ and providing notice that the investigation might "result in claims by third parties, including our customers . . . and other polyester producers, against us which may lead to fines, penalties, expenses, damages, and other Losses" which would constitute "Retained Liabilities" under the APA. Connelly Opp'n Decl., Ex. 14 (June 8, 2001 letter).

On October 31, 2002, Stanley and Arteva Specialties agreed to plead guilty to criminal antitrust conspiracy. PSF ¶ 80; DSF

¶ 1. Stanley and Arteva Specialties "d/b/a KoSa" each pleaded to one felony count of conspiring in restraint of trade in violation of the Sherman Act during the period "beginning at least as early as September 1999 and continuing until at least January 2001." *Id.* Arteva Specialties agreed to pay a $28.5 million criminal fine in connection with its plea. PSF ¶ 81; DSF ¶ 3.

Following Arteva Specialties' guilty plea, polyester staple customers filed more than fifty civil lawsuits against Arteva Specialties, KoSa and their affiliates (the "Civil Claims"). PSF ¶ 82. The plaintiffs in these actions asserted a variety of claims relating to alleged anticompetitive misconduct and sought damages covering various time periods from 1993 to 2001. PSF ¶¶ 82, 86. Some of the Civil Claims alleged anti-competitive conduct both before and after the Closing of the Polyester Business acquisition on December 10, 1998, while others alleged only post-Closing misconduct; none of the Civil Claims sought damages for only pre-Closing misconduct. Defs. Response to PSF ¶ 86.

On January 10, 2003, Koch Group counsel notified Hoechst counsel of the Civil Claims by letter, stating that Koch and/or KoSa have been named as a defendant in twenty-two pending civil antitrust actions and enclosing copies of the complaints.[10] PSF ¶ 88. Koch notified Hoechst of additional cases in two more letters dated January 17 and January 24, 2003. PSF ¶ 89. Many of the Civil Claims, including a class action, were consolidated and transferred by the U.S. Judicial Panel on Multidistrict Litigation to the District Court for the Western District of North Carolina (the

---

**10.** Defendants contend that this letter, and two others sent in January 2003, were inadequate to provide notice of a claim for indemnity under the terms of the APA. Defs. Response to PSF ¶ 88. Defendants also assert that the January 2003 letters were confidential pursuant to the parties' tolling agreement, which provided that any communications "shall be used only for purposes of settlement." *Id.* However, we reject the contention that plaintiffs' may not rely on these letters to establish the fact of notice, since defendants have raised lack of notice as a defense in this action.

"MDL Litigation")DSF ¶ 38. An antitrust class action was also filed in Canada and a state court class action involving state claims was commenced in California. DSF ¶ 39.

### E. Plaintiffs Commence This Action

Plaintiffs filed this action against defendants on November 3, 2003, seeking indemnity under the APA and alleging fraud, breach of contract, and unjust enrichment claims. The basis for each of these claims is plaintiffs' assertion that defendants sold the Polyester Business after engaging in anti-competitive conduct "often, if not continuously, from 1995 up to the date of the acquisition." DSF ¶ 36; Mazin Decl., Ex. 3 (the Complaint) ¶ 35.[11]

After the filing of this action, the Hoechst Group was sued by a number of polyester staple customers,[12] some of whom had already brought suit against the Koch Group in the Civil Claims. DSF ¶¶ 46–47. A total of five or six suits named both Koch Group and Hoechst Group entities as defendants (the exact number is disputed). PSF ¶ 87; Defs. Response to PSF ¶ 87. These claims against the Hoechst Group were consolidated with the Civil Claims filed by other polyester staple customers in the MDL Litigation in the Western District of North Carolina. Pls. CSF ¶ 141.

### F. Koch Group Settles Third Party Claims

On May 26, 2005, Koch Group counsel wrote to Hoechst Group counsel stating that Arteva Specialties was "negotiating a settlement with a significant purchaser of polyester staple fiber ... for Sherman Act and other claims asserted relating to the period of January 1995—January 2001." PSF ¶ 95; Defs. Response to PSF ¶ 95. The letter asked to discuss the settlement with the Hoechst Group in order to avoid "any subsequent dispute ... about whether the terms of [the] proposed settlement are fair and reasonable." PSF ¶ 96. According to defendants, this letter demanded a response by 5:00 PM of the following day (the Friday before Memorial Day weekend) and did not seek Hoechst's consent to settle. Defs. Response to PSF ¶¶ 95–96. The letter also stated plaintiffs' counsel's belief "that Defendants have no right to approve this settlement and that, even if they did, any such right has been waived by their refusal to indemnify our clients." *Id.*

Counsel for the Hoechst Group replied that defendants could not respond within the deadline and plaintiffs then notified defendants that they would "proceed accordingly" with settlement. PSF ¶¶ 97–98. On May 31, 2005, defendants' counsel wrote to plaintiffs that "it would not make much sense" for defendants to participate in the settlement discussion because "it is unlikely that [defendants] will have any obligation to indemnify [plaintiffs] in connection with the settlement of any polyester staple antitrust claims." PSF ¶ 99; Connelly Decl. in Supp. of Pls. Motion for Partial Summary Judgment ("Connelly Moving Decl."), Ex. 34. Defendants' counsel also stated in this letter that "if you want to go ahead and attempt to settle with third parties, that is up to you." *Id.* The letter also reserved all rights and

---

11. The parties had previously entered into an agreement to toll the statute of limitations applicable to claims arising out of the APA (the "Tolling Agreement"). DSF ¶ 35. The Tolling Agreement was executed on October 1, 2002 and was extended multiple times over the next year. Pls. CSF ¶ 135. Plaintiffs filed this action before the end of the tolling period as specified in the final amendment to the Tolling Agreement. Pls. CSF ¶ 135; Connelly Opp'n Decl., Appx. I. Tab 12 ¶ 1.

12. A smaller number of civil claims had already been brought against the Hoechst Group before the Koch Group filed this action. DSF ¶ 46.

remedies on behalf of defendants in the event that plaintiffs sought indemnification for such settlements. Defs. Response to PSF ¶ 99.

Following this correspondence, the Koch Group settled with that particular polyester staple purchaser. According to defendants, this was the fourth Civil Claims settlement that the Koch Group entered into.[13] Connelly Moving Decl., Ex. 35. The Koch Group eventually settled all of the Civil Claims against it, entering into twelve more settlement agreements after May 2005. Id.; PSF ¶ 103. The Koch Group spent $76 million in settlement payments and $59 million in legal fees defending against the Civil Claims, bringing their out-of-pocket costs to approximately $135 million (the "Defense Costs"). Pls. CSF ¶¶ 155–57.

### G. Hoechst Group Also Settles Third Party Claims

Before either the Koch Group or the Hoechst Group settled the Civil Claims, those cases proceeded through discovery, summary judgment motions were made and a trial date was set. The third party civil plaintiffs submitted expert reports supporting their claim that an antitrust conspiracy existed in the polyester staple industry from approximately late 1994 to 2001. PSF ¶ 107. Also, Stanley testified at his deposition that he had been brought into an existing antitrust conspiracy by Smith and Nixon in 1994 or 1995 (i.e., several years prior to the Closing date). PSF ¶ 100; Decl. of Brian D. Nysenbaum in Supp. of Pls. Motion for Partial Summary Judgment, Ex. 55, Stanley Depo. Tr., Feb. 7, 2006, 275:25–304:2.[14] Smith and

Nixon were never charged and deny any knowledge of an antitrust conspiracy. Defs. Response to PSF ¶ 100. According to defendants, Stanley is the only witness from either the Hoechst Group or the Koch Group who has admitted to participating in anti-competitive conduct during the pre-sale period. See Defs. Mem. in Opp'n to Pls. Motion for Partial Summary Judgment ("Defs. Opp'n Mem.") 9 n. 25.

In the period between November 2006 and August 2007, the Hoechst Group filed several motions to dismiss and a motion for summary judgment in the MDL Litigation. PSF ¶ 109. Judge Voorhees of the Western District of North Carolina denied the motions to dismiss on April 1, 2008. PSF ¶ 110. A week later, Judge Voorhees issued a one-page order which denied the Hoechst Group's motion for summary judgment and directed the parties to prepare for trial, advising that the court's written opinion would follow in due course. PFS ¶ 110; Nysenbaum Decl., Ex. 59. On June 13, 2008, before that opinion was issued, the Hoechst Group settled all the remaining claims against it. PSF ¶ 111. The Hoechst Group paid out a total of $107 million in settling the Civil Claims. Id.

### PROCEDURAL BACKGROUND

This action has been in progress for six and a half years. Plaintiffs filed their complaint on November 3, 2003 and the parties commenced discovery in early 2004. The case then lay dormant for several years awaiting the outcome of the MDL Litigation in the Western District of North Carolina. Following the settlement of that case, discovery resumed and finally

---

**13.** It is unclear whether the settlements that Koch Group entered into before May 2005 involved any claims relating to pre-Closing antitrust activity.

**14.** Stanley gave essentially the same testimony at the criminal trial of Robert Dutton, a

sales manager at a competing company in the polyester staple industry who was also charged in the antitrust conspiracy. See Nysenbaum Decl., Ex. 54, Dutton Trial Tr., Sept. 24, 2003, 366:17–368:23. Dutton was acquitted at trial.

concluded in August 2009. Plaintiffs then filed a motion for partial summary judgment on the issue of defendants' liability, and defendants moved for summary judgment on all claims. Following extensive briefing by the parties, the Court heard oral argument on these cross-motions on May 26, 2010 (the "Oral Argument").

## LEGAL STANDARDS

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

On a motion for summary judgment, the initial burden rests with the moving party to make a *prima facie* showing that no material fact issues exist for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, "[t]o defeat summary judgment, the non-movant must produce specific facts" to rebut the movant's showing and to establish that there are material issues of fact requiring a trial. *See Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir.1998) (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548). In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Lucente v. IBM Corp.*, 310 F.3d 243, 253 (2d Cir.2002).

## DISCUSSION

Plaintiffs bring this case seeking, *inter alia*, indemnity under the APA for the Defense Costs, contract damages for defendants' breach of representations and warranties, lost profits, and inflated-value damages on the theory that plaintiffs overpaid for the Polyester Business. The suit involves six counts: (I) fraudulent misrepresentation, (II) fraud based on defendants' failure to disclose, (III) fraudulent concealment, (IV) indemnification for "Retained Liabilities" under the APA, (V) indemnification for breach of representations and warranties, and (VI) unjust enrichment.

Defendants have moved for summary judgment on all counts; plaintiffs have moved for partial summary judgment on the issue of defendants' liability on the indemnity claim. For the reasons stated herein, defendants' motion is granted in part and denied in part, and plaintiffs' motion is granted.

### I. Defendants' Motion for Summary Judgment

Defendants make several arguments in support of their motion for summary judgment, which we consider in turn. For the reasons stated herein, defendants' motion is granted with respect to plaintiffs' fraud claims (Counts I, II, and III) and unjust enrichment claim (Count VI), and is denied in all other respects.

## A. Indemnity Claim Not Barred by *Texas Industries*

■ Defendants contend that plaintiffs' indemnity claim fails because the Supreme Court's decision in *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), prohibits indemnification for losses incurred through participation in an antitrust conspiracy. We find that plaintiffs' indemnity claim is not barred by *Texas Industries* or the line of cases applying that decision.

Under the APA, defendants agreed to indemnify plaintiffs for losses that relate to the operation of the business before the Closing. APA § 2.4. Defendants now seek to evade that obligation by arguing that admitted antitrust conspirators do not have a right to indemnity for antitrust damages. Mem. in Supp. of Defs. Motion for Summary Judgment ("Defs. Mem.") 12–17. To evaluate defendants' argument, the factual background of this case must be examined in context. While one of the plaintiffs here, Arteva Specialties, pleaded guilty to being part of an antitrust conspiracy in the polyester staple industry and subsequently settled numerous third party civil suits brought against them, it cannot be disputed that plaintiffs were not involved in the polyester staple industry before they acquired the Polyester Business from defendants on the date of the Closing. Moreover, viewing the facts in the light most favorable to the plaintiffs for the purposes of this motion, antitrust violative activity had occurred at the Polyester Business for several years before the acquisition.[15]

In support of their position, defendants cite *Texas Industries,* in which the Supreme Court held that there is no right to contribution for defendants in antitrust actions, either by statute or under federal common law. 451 U.S. at 646, 101 S.Ct. 2061. The Supreme Court's decision did not consider or mention a right to indemnity under contract. Since plaintiffs in this action seek indemnification pursuant to a contract governed by New York law, *Texas Industries* does not, on its own, bar plaintiffs' claim.

At least two courts have cited *Texas Industries* in refusing to enforce indemnity agreements between antitrust co-conspirators. In *MacMillan Bloedel Ltd. v. Flintkote Co.*, 760 F.2d 580 (5th Cir.1985), MacMillan (plaintiff) purchased the "Hankins" assets from Flintkote (defendant) and Flintkote agreed to indemnify MacMillan for all liabilities arising out of the operation of the assets prior to closing. After the sale closed, MacMillan settled a number of class-action antitrust claims against it. The Fifth Circuit held that MacMillan had no right to indemnity from Flintkote under the sale agreement, because the alleged antitrust scheme involved both plaintiff and defendant conspiring to fix prices even before the asset sale took place:

> The amount that MacMillan Bloedel seeks to recover here was paid because, as an alleged co-conspirator, it was a joint tortfeasor, liable jointly and severally for all of the damages sustained by virtue of the conspiracy without regard to the liability of other conspirators. **It would have been liable for the same amount had it never purchased any**

---

**15.** Troy Stanley, the only individual defendant who pleaded guilty to antitrust conspiracy, testified at his deposition that he first engaged in antitrust activity three or four years before the Closing, while the Polyester Business was operated by Hoechst and its affiliates. PSF ¶ 100. Although defendants vigorously dispute Stanley's testimony, we view the facts in the light most favorable to the plaintiffs for the purposes of defendants' summary judgment motion. *See Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. 1348.

**assets from Flintkote.** Its liability, therefore, arose neither from Flintkote's pre-acquisition torts nor from Flintkote's breach of warranty.... Due to the joint and several liability of co-conspirators, **MacMillan Bloedel was already potentially liable for Flintkote's supposed antitrust violations when it purchased the Hankins assets.**

*MacMillan,* 760 F.2d at 584–5 (emphasis added). The court also stated that, since MacMillan and Flintkote would each have been liable to the antitrust plaintiffs for the amount at issue, MacMillan's attempt to obtain indemnity from Flintkote was equivalent to a claim of contribution between antitrust conspirators, which is impermissible under *Texas Industries. Id.* at 584.

The facts of *Ferro Corp. v. Cookson Group,* 561 F.Supp.2d 888 (N.D.Ohio 2008), *aff'd,* 585 F.3d 946 (6th Cir.2009), are very similar. Ferro (plaintiff) purchased the "Synpro" assets from Cookson (defendant) and Cookson agreed to indemnify Ferro for all pre-sale liabilities. Ferro then faced antitrust claims and sought indemnity from Cookson for the pre-acquisition liabilities of Synpro. The antitrust suits alleged that Ferro had already been involved in the antitrust conspiracy for approximately five years before it acquired the Synpro assets. 561 F.Supp.2d at 891–92. The District Court for the Northern District of Ohio refused to enforce the indemnity provision, finding "no basis upon which to distinguish *MacMillan." Id.* at 912. The court noted that "Ferro, like MacMillan Bloedel, faced the same amount of liability in the Antitrust Cases whether or not it acquired the Synpro assets." *Id.* at 913 n. 35.

Neither *MacMillan* nor *Ferro* purports to invalidate every agreement that might provide indemnity to an antitrust conspirator. Indeed, the Fifth Circuit in *MacMillan* explicitly stated that it "did not find it

necessary to define the policy of the antitrust laws or to decide whether that policy would invalidate some or all indemnity agreements made in connection with the sale of a business." 760 F.2d at 584.

Moreover, the present action is distinguishable from *MacMillan* and *Ferro* because the indemnitee-plaintiffs in those cases, unlike the Koch Group, were participants in the alleged antitrust activity before the asset sales took place. Since antitrust conspirators are jointly and severally liable, MacMillan and Ferro would have been liable for pre-sale antitrust activity even if they had never acquired the Hankins assets or the Synpro assets, respectively. The Koch Group, on the other hand, clearly could not have participated in the antitrust conspiracy before it acquired the Polyester Business: Koch was not involved in the polyester staple industry at all before the Closing, and the other entities in the Koch Group did not yet exist because they were formed for the purpose of absorbing the Polyester Business.

Thus, to the extent that plaintiffs are only seeking indemnity for damages that resulted from alleged **pre**-Closing activity, this is not a case of a joint tortfeasor attempting to evade joint and several liability by seeking indemnity from an equally liable co-conspirator. That was the situation which the courts in *MacMillan* and *Ferro* addressed when they applied *Texas Industries* to reject an indemnity claim. Here, by contrast, plaintiffs' claim for indemnity seeks to hold accountable the only party who could be responsible for the alleged pre-Closing antitrust activity, namely Hoechst and its affiliates. The Hoechst Group operated the Polyester Business until the Closing and agreed to indemnify the buyer for all losses that resulted from the pre-Closing operation of the business. Defendants cannot now es-

cape from their indemnity obligation under the parties' negotiated agreement.[16]

At the same time, it is clear that the Koch Group cannot obtain indemnity for damages resulting from **post**-Closing antitrust activity. Under the APA, the parties made the Closing date a bright-line for the division of responsibility, making the buyer liable for obligations resulting from post-Closing activity and the seller liable for obligations arising out of the operation of the Polyester Business "prior to or as of the Closing." APA §§ 2.3, 2.4. Despite this provision in their agreement, both plaintiffs and defendants argue in their summary judgment motions that the other party is liable for one hundred percent of the underlying antitrust damages. The parties' absolutist approach, which resulted in many pages of unnecessary briefing and letters, ignores the terms of the APA, which makes the Hoechst Group liable for conduct that occurred before or upon the Closing on December 10, 1998, and the Koch Group liable for conduct thereafter.

In addition to enforcing the parties' agreement, this is a sensible result because it holds each party responsible for the conduct that occurred at the Polyester Business while that company operated the business. As we noted at oral argument, this appeals to a sense of fundamental fairness and promotes the value of personal responsibility that is inherent in our justice system. Oral Argument Tr. 4.

### B. *In Pari Delicto* Defense Fails

Defendants argue that plaintiffs' claims are barred by the doctrine of *in pari*

*delicto* because "the plaintiff is as or more culpable than the defendant in the conduct forming the basis of the complaint." Defs. Mem. 18–19 (quoting *UCAR Int'l, Inc. v. Union Carbide Corp.*, 119 Fed.Appx. 300, 301–02 (2d Cir.2004) (Summary Order)).

■ The classic formulation of the *in pari delicto* doctrine is that it provides a defense only where "plaintiff truly bore at least substantially equal responsibility for his injury." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 307, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). More recently, courts have expanded the defense to where the plaintiff has participated "in some of the same sort of wrongdoing" as the defendant. *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1090 (2d Cir. 1997). In addition, public policy implications must be carefully considered before the defense is allowed. *Pinter v. Dahl*, 486 U.S. 622, 633, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Under the Second Circuit's approach, the *in pari delicto* defense should be applied when the following two elements are present: (1) "as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress," and (2) public policy considerations favor applying the defense. *Peltz*, 115 F.3d at 1090 (quoting *Bateman Eichler*, 472 U.S. at 310–11, 105 S.Ct. 2622); *see BrandAid Marketing Corp. v. Biss.*, 462 F.3d 216, 218–19 (2d Cir.2006).

■ Defendants' *in pari delicto* argument fails here because public policy considerations do not favor applying the defense.[17] The underlying policy of the *in*

---

16. Defendants also challenge plaintiffs' fraud, contract, and unjust enrichment claims on the grounds that *Texas Industries* bars all claims seeking contribution for antitrust damages, however they are "styled." Defs. Mem. 17. Since we find that *Texas Industries* does not bar plaintiffs' straightforward indemnity claim in the present case, defendants' argument fails with respect to those other causes of action as well.

17. The first element also weighs against application of the *in pari delicto* defense because plaintiffs do not bear at least substantial responsibility for the injuries they seek to redress. Under the APA, plaintiffs can only obtain indemnity for losses resulting from pre-Closing activity. As discussed *supra*, plaintiffs are plainly not responsible for any pre-Closing antitrust conduct. Similarly, plaintiffs' claims for fraud and for breach of

*pari delicto* defense is (a) to conserve court resources by not hearing disputes among wrongdoers, and (b) to deter unlawful conduct by denying relief to those who broke the law. *See Bateman Eichler*, 472 U.S. at 306, 105 S.Ct. 2622.

■ The first consideration might weigh towards applying the defense here, since one of the plaintiff entities, Arteva Specialties, has pleaded guilty to criminal antitrust conspiracy. However, the second consideration weighs against allowing defendants to assert an *in pari delicto* defense because to do so would undermine the goal of deterrence. Assuming that the Hoechst Group engaged in pre-Closing antitrust activity, the application of *in pari delicto* would permit them to escape the full repercussions of their conduct because they sold the Polyester Business to another company. This result would encourage a company participating in an antitrust conspiracy to sell off the part of its business engaged in wrongdoing to an innocent

buyer. As part of that sale, the seller— protected by the *in pari delicto* defense from any future claims by the buyer— could indemnify the buyer for pre-sale liabilities and provide representations that the business was in compliance with all laws, thus exacting a higher price for the business.[18] This perverse result would contravene the public policy of deterring violation of the federal antitrust laws, and we therefore decline to apply the *in pari delicto* defense to defendants here.[19]

## C. Fraud Claims Are Duplicative of Contract Claims

In Counts I, II, and III, plaintiffs bring fraud claims alleging that defendants made misrepresentations in connection with the sale of the Polyester Business. According to plaintiffs, the Hoechst Group failed to disclose the Polyester Business's involvement in an antitrust conspiracy, misrepresented that the business was in compliance

contractual representations and warranties relate to defendants' conduct prior to, and upon, entering the APA.

**18.** Defendants respond to this policy concern by arguing that the transaction in this case was merely an asset purchase, rather than a stock purchase or the acquisition of an entire business. Oral Argument Tr, 10–11. Indeed, if a company sells only its plants or equipment, there is little concern that the seller could use that transaction to evade the antitrust laws. However, the acquisition in this case, while formally structured as an asset purchase, involved the transfer of product lines, personnel, and management from Hoechst to the Koch Group. We note especially that Stanley, a key individual who moved with the Polyester Business, testified to engaging in antitrust conduct while he worked for both companies. Under these circumstances, the policy concern described above is real.

**19.** Defendants rely heavily on a Second Circuit summary order, *UCAR Int'l, Inc. v. Union Carbide Corp.*, 119 Fed.Appx. 300 (2d Cir.

2004), in which the Circuit upheld the application of the *in pari delicto* defense to prevent a corporation that had pled guilty to antitrust conspiracy from bringing claims against the corporation's former shareholders and directors for breach of fiduciary duty and unjust enrichment. The application of *in pari delicto* in *UCAR* is entirely consistent with the approach we have taken here. UCAR was a corporation that underwent a stock repurchase but remained the same entity, legally responsible for all its prior liabilities. The Koch Group, on the other hand, seeks to recover damages for conduct that occurred before it acquired the Polyester Business, pursuant to a contract in which the seller agreed to be responsible for pre-Closing liabilities. Furthermore, the application of the *in pari delico* defense in *UCAR* served, as the District Court noted, important public policy goals under the law of Delaware. *UCAR Int'l, Inc. v. Union Carbide Corp.*, No. 00 Civ. 1338(GBD), 2004 WL 137073, at *18 (S.D.N.Y. Jan. 26, 2004). By contrast, policy considerations weigh against the application of *in pari delicto* here, for the reasons stated above.

with the law, and, as a result, understated the business's financial liabilities.

■ Defendants move for summary judgment on the fraud claims on the grounds that they are duplicative of plaintiffs' breach of contract claims. Under New York law, a claim of fraud for breach of representations and warranties included in a contract is not legally sufficient unless the complaining party can "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (restating New York law) (internal quotations and citations omitted). In this case, plaintiffs do not allege that defendants owed them a legal duty separate from the duty to perform under the contract. Nor do plaintiffs allege special damages that are unrecoverable as contract damages.[20] The operative question is therefore whether defendants' alleged misrepresentations are "collateral or extraneous to the contract." *Id.*

■ The Second Circuit has held that, under New York law, alleged misrepresentations are collateral or extraneous to the contract if they "involve misstatements and omissions of present facts," rather than "contractual promises regarding prospective performance." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir.2007); *see Stewart v. Jackson & Nash*, 976 F.2d 86, 88–89 (2d Cir.1992). In *Merrill Lynch*, the Circuit addressed both a fraud and a contract claim arising out of the sale of a business. The buyer's fraud claim was based on the seller's misstatement of financial records provided during due diligence, while the buyer's contract claim was for the breach of seller's representation, in the purchase agreement, that the target's financial statements contained no material misstatement or omission. The Second Circuit permitted plaintiff's fraud and contract claims to proceed concurrently because seller's alleged misstatement of financial information constituted a misstatement of present fact. *Merrill Lynch*, 500 F.3d at 184. The court then stated: "That the alleged misrepresentations would represent, if proven, a breach of the contractual warranties as well does not alter the result." *Id.*

In advancing their fraud claims, plaintiffs rely on the alleged misrepresentation contained in the Hoechst Group's response to a list of questions that Koch sent on May 28, 1998 as part of the due diligence process. The Hoechst Group stated that the Polyester Business had no instances of "material noncompliance" with any laws or regulations.[21] PSF ¶¶ 21–22. Whatever ambiguity might attach to the due dili-

---

**20.** Although plaintiffs request punitive damages, which are only available on their fraud claims, they have not alleged any actual harm, proximately caused by defendants' alleged misrepresentations, for which plaintiffs could not recover under breach of contract. This demand for punitive damages is insufficient to support a separate fraud claim under New York law. *See Butvin v. DoubleClick, Inc.*, No. 99 Civ. 4727(JFK), 2000 WL 827673, at *9 (S.D.N.Y. June 26, 2000) ("Although Plaintiff additionally seeks punitive damages under the fraud claim, there is no allegation that the punitive damages are sought as spe-

cial damages that were caused by the misrepresentation."); *Krantz v. Chateau Stores of Canada Ltd.*, 256 A.D.2d 186, 683 N.Y.S.2d 24, 25 (1st Dept.1998) (dismissing fraud claim after finding that "with the exception of the unelaborated request for punitive damages on the fraud claim, plaintiff has not claimed any special damages proximately caused by the false representation").

**21.** Plaintiffs also allege fraud based on defendants' failure to disclose the Polyester Business's unlawful antitrust activity and the financial liability caused by that activity. The analysis for each allegation is the same, since

gence question, there is none in the APA, which contained Hoechst's representation that the business complied with all laws. APA § 7.12(a). The APA provided that, except for the representations and warranties in the APA, Hoechst was selling the polyester business "AS IS, WHERE IS" and that the Hoechst Group did not make "ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED ..., ALL OF WHICH ARE HEREBY EXPRESSLY EXCLUDED AND DISCLAIMED." APA § 7.29 (emphasis in original). The APA also contained a merger clause and a limited remedies provision that restricted the monetary remedies available to contractual indemnity only. APA §§ 19.7, 19.10.

Plaintiffs contend that, under *Merrill Lynch,* defendants' alleged misrepresentation was collateral to the APA because the statement during due diligence that the Polyester Business was in compliance with the law constitutes a statement of present fact. Pls. Opp'n Mem. 28. However, plaintiffs' position is clearly at odds with the terms of the APA, under which plaintiffs disclaimed all extraneous representations and explicitly agreed to limit their remedies to contractual indemnity. APA §§ 7.29, 19.10. This presents a tension in the law: while sophisticated parties can negotiate binding disclaimers and limitations of remedies in their contracts, the language of *Merrill Lynch* appears to suggest that every statement of present fact by a contracting party could form the basis of a separate fraud claim if the statement is alleged to be false.

While *Merrill Lynch* appears to create this tension in situations where there is both a misstatement of present fact and a negotiated disclaimer or limitation of rem-

edies, a closer look at the facts of *Merrill Lynch* establishes that the Second Circuit did not purport to abrogate the validity of contract provisions that limit remedies or disclaim outside representations and warranties. In the *Merrill Lynch* decision below, the district court noted that the purchase agreement in that case contained a limited remedies provision that carved out an exception allowing the parties to bring "claims of, or causes of action arising from, fraud." *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.,* No. 02 Civ. 7689(HB), 2005 WL 832050, at *3 (S.D.N.Y. Apr. 12, 2005). Thus in *Merrill Lynch* there was no contractual barrier to plaintiffs' fraud claims; the Second Circuit never had to reach the question of whether the parties' own agreement would preclude a fraud claim based on a misstatement of present fact.

This understanding of *Merrill Lynch* comports with the decisions of other courts in this district that have employed a two-stage approach to determine whether a statement was collateral or extraneous to the contract. *See Pfizer, Inc. v. Stryker Corp.,* No. 02 Civ. 8613(LAK), 2003 WL 21660339 (S.D.N.Y. July 15, 2003); *DynCorp v. GTE Corp.,* 215 F.Supp.2d 308 (S.D.N.Y.2002). Under that approach, the first and threshold question is whether the alleged misrepresentation is a statement of present fact. *See Pfizer,* 2003 WL 21660339, at *1; *DynCorp,* 215 F.Supp.2d at 325. The second, distinct question is whether the terms of the parties' agreement preclude a fraud suit on the basis of the alleged misstatement. In *Pfizer,* Judge Kaplan found that the applicable limited remedies provision was ambiguous and that, since the parties' briefing did not sufficiently address the issue, the fraud claim could survive a motion to dismiss.[22]

these are simply different articulations of the same underlying fraud.

**22.** Judge Kaplan returned to this issue at the summary judgment stage and determined that the fraud claim was not barred by the terms

*Pfizer,* 2003 WL 21660339, at *2–3. In *DynCorp* however, Judge Hellerstein found that the terms of the purchase agreement precluded DynCorp's fraud claims, stating:

> In the case at bar, unlike other cases cited by plaintiff, the Purchase Agreement made clear that [the seller] would have "no liability or indemnification obligation to Buyer," "[e]xcept for the representations and warranties contained in this Agreement." This condition of exclusivity was sounded throughout the Purchase Agreement, in the sections providing DynCorp's disclaimers, in the sections limiting damage recoveries, and generally, as my citations a few pages earlier make clear. DynCorp's claims of fraud concerning the breach of contractual warranties are not "collateral or extraneous" to these terms and conditions; rather, they contradict them. If I were to rule otherwise, the strong New York policy, giving autonomy to contracting parties to allocate risks, and rights, obligations, warranties and disclaimers, as they see fit, would be compromised.

*DynCorp,* 215 F.Supp.2d at 326 (citation omitted).

The facts of this case are strikingly similar to *DynCorp.* The parties' intention to rely exclusively on the remedies and representations set forth in the APA was "sounded throughout" the agreement. That intent is made clear by the cumulative effect of the merger clause, the limited-remedies provision (which, unlike *Merrill Lynch,* carves out no exception for fraud claims), and the disclaimer of outside warranties (the only provision in the APA presented in entirely capitalized typeface). APA §§ 7.29, 19.7, 19.10. In addition, the parties to the APA were sophisticated entities, represented by counsel, who could easily have negotiated different terms to permit future claims for fraud had they wished to do so.

Accordingly, we find that plaintiffs' fraud claims are not "collateral or extraneous" to the APA and cannot stand concurrently with plaintiffs' breach of contract claims. Defendants' motion for summary judgment on Counts I, II, and III is therefore granted.

## D. Unjust Enrichment Claim Dismissed

■ Defendants contend that plaintiffs cannot bring a claim for unjust enrichment because the APA governs the subject of this action. We agree. Unjust enrichment is a quasi-contractual doctrine that applies only in the absence of a contract. *Langenberg v. Sofair,* No. 03 Civ. 8339(KMK)(FM), 2006 WL 3518197, at *7 (S.D.N.Y. Dec. 7, 2006) (citing *In re Chateaugay Corp.,* 10 F.3d 944, 958 (2d Cir. 1993)). Plaintiffs argue that since KoSa was the only entity that was a party to the APA, the other plaintiff entities may properly bring an unjust enrichment claim. However, under New York law, "a claim for unjust enrichment may be barred by a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract." *Serio v. Human Dynamics Corp.,* No. 04 Civ. 5146(RMB), 2008 WL 2600631, at *3 (S.D.N.Y. June 25, 2008); *see Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F.Supp.2d 275, 311 (S.D.N.Y.1998). Accordingly, defendants' motion for summary judgment is granted with respect to plaintiffs' unjust enrichment claim.

---

of the applicable limited remedies provision. *Pfizer, Inc. v. Stryker Corp.,* 348 F.Supp.2d 131, 154 (S.D.N.Y.2004). However, the fraud claim did not survive summary judgment because Stryker failed to meet its burden on the element of scienter. *Id.* at 155.

### E. The Koch Group Complied with the APA's Notice and Consent Provisions

Defendants move for summary judgment on the indemnity claim on the grounds that plaintiffs failed to provide sufficient notice of the Civil Claims, and failed to seek consent to settle those claims, as required by the APA. Defs. Mem. 29–32; *see* APA §§ 17.4(a) (i), (ii). We reject defendants' argument because the undisputed facts show that plaintiffs actually complied with the relevant provisions of the APA.

The APA requires that, if a third party brings a claim against any entity in the Koch Group for which Hoechst "would be liable," the Koch Group must notify Hoechst in writing "with reasonable promptness . . ., specifying the nature of and the specific basis for such Claim and the amount or the estimated amount thereof to the extent then feasible to determine." APA § 17.4(a)(i). The APA then defines this written notification as a "Claim Notice" and provides that any failure to provide a Claim Notice "shall not constitute a waiver of any rights of the Indemnified Party except to the extent the rights of the Indemnifying Party are actually prejudiced as a result of the delay or lack of detail." *Id.*

It is clear that the Koch Group satisfied the notice requirement in this case. On April 2, 2001, the General Counsel for Arteva Specialties sent a letter to Hoechst which described the DOJ investigation of Arteva Specialties and identified itself as a claim notice. Connelly Opp'n Decl., Ex. 12. The letter stated that "the allegations asserted by the DOJ, if true, may represent Hoechst 'Retained Liabilities' as such term is defined in the [APA]," because "liability associated with any pre-Closing failure of Hoechst or its affiliates to comply with U.S. antitrust laws falls squarely within the definition of Retained Liabilities." *Id.* The letter also stated that while "it was not possible to estimate accurately the magnitude" of any loss, such losses would consist of "legal fees and expenses to investigate and defend against any action or proceeding." *Id.*

█ The April 2, 2001 letter was sufficient to constitute a Claim Notice because the Koch Group "specified the nature of and the specific basis for" the claim against it. APA § 17.4(a)(i). The letter need not have contained an estimate for the amount of the claim because that was not feasible at the beginning of a DOJ investigation. Defendants do not contend that plaintiffs failed to notify them "with reasonable promptness," APA § 17.4(a)(i), but argue instead that the Claim Notice was "premature" and "speculative" because none of the Civil Claims had yet been filed. Defs. Mem. 31. This is a specious argument. The Koch Group could not violate the APA's notice requirement by giving Hoechst too much notice. To the extent that plaintiffs' first letter lacked granular detail, this was remedied by numerous follow-up communications, between June 8, 2001 and January 24, 2003, in which plaintiffs described the nature of the third Party Civil Claims and attached copies of the complaints in those actions.

Additionally, defendants' notice argument fails because the alleged lack of notice only precludes plaintiffs' indemnity claim to the extent that defendants were "actually prejudiced" by the delay or lack of detail. APA § 17.4(a)(i). Defendants suffered no prejudice here because Hoechst became fully informed about the Civil Claims well before the Koch Group began to settle them. First, Koch and Hoechst entered a tolling agreement on October 1, 2002, and subsequently engaged in discussions about this suit and the various third party claims against them. Sec-

ond, Hoechst was a party to the MDL Litigation in the Western District of North Carolina, which included a large proportion of the Civil Claims. By the time plaintiffs' settled the Civil Claims, in the years of 2005 to 2008, it is hard to fathom how defendants could have been "actually prejudiced" by an allegedly deficient Claim Notice sent in April 2001.

Defendants also argue that plaintiffs' indemnity claim fails because plaintiffs did not obtain defendants' consent to settle, in contravention of the APA's provision that "[n]o Indemnifying Party shall be liable to an Indemnified Party for any settlement of any Third Party Claim without the consent of the Indemnifying Party." APA § 17.4(a)(ii); Defs. Mem. 2 9–30. Plaintiffs respond that defendants refused plaintiffs' invitation to take part in settlement discussions and persistently denied their duty to indemnify. Pls. Opp'n Mem. 34–35.

The parties' dispute focuses primarily on their communications in May 2005.[23] On May 26, Hoechst received a letter from Koch Group counsel stating that Arteva Specialties was "negotiating a settlement with a significant purchaser of polyester staple fiber" and asking to discuss the settlement with the Hoechst Group in order to avoid "any subsequent dispute . . . *about whether the terms of [the] proposed settlement are fair and reasonable.*" PSF ¶ 96. According to defendants, this letter demanded a response by 5:00 PM of the following day, which was the Friday before Memorial Day weekend. Defs. Response to PSF ¶¶ 95–96. The letter also stated plaintiffs' counsel's belief "that Defendants have no right to approve this settlement and that, even if they did, any such right has been waived by their refusal to indemnify our clients." *Id.* On May 31, 2005, defendants' counsel wrote to plaintiffs that "it would not make much sense" for defendants to participate in the settlement discussion because "it is unlikely that [defendants] will have any obligation to indemnify [plaintiffs] in connection with the settlement of any polyester staple antitrust claims." PSF ¶ 99; Connelly Moving Decl., Ex. 34. Defendants' counsel also stated in this letter that "if you want to go ahead and attempt to settle with third parties, that is up to you." *Id.*

Plaintiffs' May 26 letter contained mixed signals on the issue of consent, because although it invited Hoechst to participate in the settlement discussion, it also denied Hoechst's right to consent and specified an extremely short period for Hoechst to respond. However, defendants' May 31 letter responded with a clear message: Hoechst denied their liability under the indemnity provision and gave plaintiffs the green light to settle with third parties.[24] That letter is fatal to defendants' argument here because Hoechst waived its right to consent by telling the Koch Group that it was "up to [them]" to

---

**23.** In their brief opposing plaintiff's motion for partial summary judgment, defendants state for the first time that plaintiffs entered three settlement agreements prior to May 2005, in which defendants claim they had no opportunity to participate or consent. Defs. Opp'n Mem. 29 n. 72. Although these early settlements were not the subject of any specific motion, they could be relevant to plaintiffs' indemnification claim: plaintiffs would not be able to recover indemnity for any part of those settlements if the facts bear out the conclusion that defendants did not have an opportunity to participate or consent.

**24.** As we noted at Oral Argument, defendants could have chosen to respond differently to plaintiffs' May 26 letter. Oral Argument Tr. 45–46. Defendants could have asked for more time to respond, cited their consent-to-settlement right under the APA, and expressed their desire to participate in this settlement discussion or, at least, in any future settlement discussions.

settle with "third parties" (plural).[25] As a result, plaintiffs had the right to settle not only with that particular polyester purchaser, but also with other third parties who brought the Civil Claims.

■■■■■ Accordingly, we reject defendants' argument that plaintiffs were required to seek consent for settlements that occurred after the May 2005 exchange of letters. An indemnitee need not continue to ask their indemnitor for consent to settle after being repeatedly rebuffed. *See TLC Beatrice Int'l Holdings, Inc. v. CIG-NA Ins. Co.*, No. 97 Civ. 8589(MBM), 2000 WL 282967, at *4 (S.D.N.Y. Mar. 16, 2000) ("[A] claimant should not be required to approach his insurer, hat in hand, and request consent to settle with another when he has already been told, in essence, that the insurer is not concerned, and he is to go his way.") (quoting *Stephens v. State Farm Mut. Auto. Ins. Co.*, 508 F.2d 1363, 1366 (5th Cir.1975)). Under New York law, "if the indemnitor is given notice of the claim or proceeding against the indemnitee and declines to defend, then the indemnitor is bound by any reasonable good faith settlement the indemnitee may make." *Baker v. Northeastern Indus. Park, Inc.*, 73 A.D.2d 753, 423 N.Y.S.2d 308, 311 (3rd Dept.1979). Courts apply this rule even when the parties' agreement provides the indemnitor with an explicit consent right over settlements. *See Park Place Entm't Corp. v. Transcon. Ins. Co.*, 225 F.Supp.2d 406, 413 (S.D.N.Y.2002); *Conopco, Inc. v. Imperial Chem. Indus.*

*PLC*, No. 97 Civ. 5529(AKH), 1999 WL 1021077, at *5 (S.D.N.Y. Nov. 8, 1999).

Since plaintiffs complied with the notice and consent provisions under the APA, we reject defendants' arguments to the contrary and deny defendants' motion for summary judgment on the indemnity claim.

**F. All Plaintiffs Have Standing**

Defendants contend that none of the plaintiff entities, except for Arteva Specialties, have standing. Defs. Mem. 19–20. Since we grant defendants' motion for summary judgment on plaintiff's fraud and unjust enrichment claims (Counts I, II, III, and VI), we focus our standing analysis on plaintiffs' contract claims (Counts IV and V). Under the APA, Hoechst agreed to indemnify the "Buyer Indemnified Parties," which includes KoSa (the "Buyer") and KoSa's "Affiliates." APA § 12.1(a). Koch, Arteva Specialties, and Arteva Services are all "Affiliates" of KoSa because each of these entities is "directly or indirectly controlling, controlled by or under common control with" KoSa. APA § 1.1. In addition, each of the plaintiff entities alleges that they suffered "Losses," as defined by the APA. *Id.* Accordingly, all of the plaintiffs have standing to bring the contract claims.[26]

**G. Claims Satisfy the Statute of Limitations**

Defendants raise several arguments alleging plaintiffs' failure to satisfy the applicable statute of limitations on various claims. For the reasons stated above, we

---

**25.** Defendants argue that their May 31 letter cannot be read as a waiver of their consent-to-settlement right because, under the APA, "no waiver shall be deemed to have been made by any Party of any rights under this Agreement unless the same should be in a writing that expressly refers to this Section 19.9." APA § 19.9. However, even if defendants formally retained their consent right, the reality of the situation was that defendants chose to deny all liability and to stay out of

any settlement discussions. Defendants now face the consequences of that strategic choice, and may not wield their consent-to-settlement right as a defense against plaintiffs' indemnity claim.

**26.** Since standing presents a threshold, jurisdictional issue, we note that plaintiffs would also have had standing on their fraud and unjust enrichment claims.

need only consider whether plaintiffs satisfied the statute of limitations on their contract claims. Defendants concede that plaintiffs' claim for indemnity for Defense Costs is timely. Defs. Mem. 20 n. 14. The remaining issue is therefore whether plaintiffs' claim for breach of representations and warranties is timely.

Under the APA, the statute of limitations for a claim of breach of representations and warranties was set at thirty months from the Closing date. APA § 17.1(a). This statute of limitations is tolled from the date that an indemnified party submits a Claim Notice. APA § 17.1(b). Plaintiffs sent the Hoechst Group a valid Claim Notice on April 2, 2001,[27] which was less than thirty months after the Closing of the acquisition on December 10, 1998. Since the earliest date on which defendants' alleged breach could have occurred was the Closing, plaintiffs' claim is timely.[28]

## H. Types of Damages Available

■ Defendants raise various arguments attempting to limit the types of damages that plaintiffs can recover in this

suit. None of these arguments support defendants' motion for summary judgment. The buyer of a business bringing a breach of contract claim is entitled to be put in the position they would have occupied had the seller's representations and warranties been true. *See, e.g., Merrill Lynch,* 500 F.3d at 185. Such damages are "general rather than consequential" and therefore the plaintiff "is required to show with reasonable certainty the fact of damage, not its amount." *Id.* Plaintiffs in this case have easily met their obligation to show the fact of damage.[29]

■ Additionally, under the APA, plaintiffs are entitled to indemnification for any "Losses" resulting from defendants' Retained Liabilities or from defendants' breach of any representations and warranties. Under the APA, "Losses" are defined broadly and include "Consequential Losses," which in turn include "business interruptions and loss of profits." APA § 1.1. Although plaintiffs may ultimately have difficulty establishing lost profits damages that are not speculative, the issue raises questions of fact that cannot be resolved at summary judgment.[30]

27. *See* Part I.E, *supra.*

28. Plaintiffs also seek inflated-value damages under breach of contract on the theory that they overpaid for the Polyester Business. These damages pertain to KoSa (the buyer) and Koch (who provided funds for the purchase price). Although it is not clear from defendants' briefing, defendants appear to argue that this claim is not subject to the thirty-month statute of limitations set forth in the APA. Nevertheless, this claim is also timely. Plaintiffs entered a tolling agreement with defendants on October 1, 2002, less than four years after the Closing. Assuming defendants are correct that, under New York's conflict of law rules, the Court must apply the law of the plaintiff's principal place of business, the applicable statute of limitations would be either four or five years. KoSa has its principal place of business in Texas, which has a four-year statute of limitations. *See* Tex. Civ. Prac. & Rem.Code § 16.004 (2009); Compl. ¶ 8.

Koch has its principal place of business in Kansas, which has a five-year statute of limitations. *See* Kan. Stat. Ann. § 60–511 (2008); Compl. ¶ 7.

29. Plaintiff's submitted expert testimony calculating the amount that they overpaid for the Polyester Business. Defendants contend that plaintiffs have failed to show inflated-value damages because, according to defendants' strained logic, the appropriate value for the Polyester Business is in fact zero. Defs. Mem. 38. Setting aside the absurdity of defendant's position, this argument simply raises an issue of fact on the appropriate amount of damages.

30. Under New York law, lost profits may be recoverable in a breach of contract action, but the plaintiff bears the burden of proving such damages with "reasonably certainty." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* No. 97 Civ. 4978(LMM), 2002 WL 1334809,

## II. Plaintiffs' Motion for Partial Summary Judgment

We turn now to plaintiffs' motion for partial summary judgment on the issue of defendants' liability on the indemnity claim. (Count IV). Plaintiffs seek a judgment that defendants are liable for at least some portion of the Defense Costs, reserving for trial a determination of the appropriate amount of damages. Mem. in Supp. of Pls. Motion for Partial Summary Judgment ("Pls. Mem.") 2. For the reasons discussed below, plaintiffs' motion is granted.

Under the APA, Hoechst agreed to indemnify the Koch Group for all "Losses" caused by Hoechst's failure to discharge the "Retained Liabilities," *i.e.,* "all liabilities and obligations resulting from or in connection with, directly or indirectly ... the conduct of the Polyester Business ... prior to or as of the Closing." APA § 2.4, 17.2(a)(ii). Plaintiffs contend that at least part of the Defense Costs constitute Retained Liabilities because some of the Civil Claims against the Koch Group sought damages for pre-Closing antitrust activity. According to plaintiffs, defendants are liable for indemnity because defendants had proper notice of the Civil Claims, plaintiffs faced "potential liability" for those claims, and plaintiffs' settlements were reasonable and in good faith.

In response to plaintiffs' motion, defendants principally repeat the defenses they raised on their motion for summary judgment. We reject those arguments for the reasons discussed above. *See* Part I.A, B, E, F, G. In addition, defendants argue that: (A) none of the Defense Costs represent Retained Liabilities; (B) plaintiffs must establish "actual liability" in order to obtain indemnity; (C) even under a "potential liability" standard, defendants are not responsible; (D) plaintiffs' settlements were not reasonable; and (E) there are issues of material fact with respect to defendants' liability. Defs. Opp'n Mem. 13–16, 25–30. We address each of these issues in turn.

### A. Some Portion of the Defense Costs Constitutes "Retained Liabilities" under the APA

 Plaintiffs have properly established that at least some of the Defense Costs are Retained Liabilities. Many of the Civil Claims complaints alleged that the Polyester Business was involved in antitrust activity for years before the Closing in December 1998, while the business was operated by the Hoechst Group. PSF ¶¶ 82, 86. These complaints sought damages from the Koch Group covering various time periods from 1993 to 2001. *Id.* According to defendants, plaintiffs paid $24 million in settlement costs to third party plaintiffs who alleged both a pre-and post-Closing antitrust conspiracy. Defs. Opp'n Mem. 14 n. 35. Also, Troy Stanley, the only individual defendant who pleaded guilty to criminal antitrust violations, testified that he participated in an antitrust conspiracy at the Polyester Business as early as 1994 or 1995. Nysenbaum Decl., Ex. 55, Stanley Depo. Tr., Feb. 7, 2006, 275:25–304:2; Ex. 54, Dutton Trial Tr., Sept. 24, 2003, 366:17–368:23. These facts make it clear that some part of the Defense Costs relates to the pre-Closing operation of the Polyester Business, making them "Retained Liabilities" under the APA.

Defendants make numerous arguments purporting to demonstrate that, of the $24 million paid to settle claims alleging misconduct between 1993 and 2001, and of the millions of dollars in legal fees spent defending against those claims, not a single

at *3 (S.D.N.Y. June 17, 2002). "[A] claimant cannot establish lost profits with the law's requisite certainty where its calculation is dependent upon a host of assumptions concerning uncertain contingencies." *Id.* (citation omitted).

penny relates to activity before December 10, 1998. In support of their position, defendants point out that "none of the [Civil Claims] complaints involves **only** allegations of a pre-Sale conspiracy." Defs. Opp'n Mem. 15 (emphasis added). Yet this fact in no way leads to the conclusion that the complaints did not cover pre-Closing activity. Similarly, it is true that Arteva Specialties pleaded guilty to antitrust conspiracy beginning "at least as early as September 1999." Defs. Opp'n Mem. 14. But the mention of September 1999 in the context of a criminal plea is entirely compatible with the fact that the Koch Group settled with third party civil plaintiffs for alleged antitrust conduct stretching back to 1993.[31] Defendants also complain that the Civil Claims settlement agreements did not release Hoechst and its affiliates, yet nothing in the APA states that such a release is a prerequisite for seeking indemnity.[32] Defs. Letter to the Court, dated June 1, 2010, at 2.

Defendants' remaining arguments are properly addressed to the amount of damages and not to the issue of whether defendants are liable to plaintiffs for at least part of the Defense Costs. For example, defendants point out that "[n]early half" of the MDL antitrust complaints allege only post-Closing conduct. Defs. June 1, 2010 Letter, at 3. This is wholly irrelevant, however, to whether defendants are liable for some of the Defense Costs relating to the majority of complaints that allege pre-Closing conduct. As we noted repeatedly at Oral Argument, the APA does not permit plaintiffs to recover indemnity for "Assumed Liabilities," *i.e.*, for losses that relate to the operation of the Polyester Business after the Closing. APA § 2.3(a); Oral Argument Tr. 4,6, 51. Accordingly, the calculation of damages on plaintiffs' indemnity claim will involve apportioning the Defense Costs between Assumed and Retained Liabilities.[33] Yet the issue of damages is not before the Court on this motion; the fact that defendants are not responsible for the entirety of the Defense Costs is no impediment to granting plaintiffs summary judgment on liability.

## B. Plaintiffs Need Only Establish Potential Liability for the Civil Claims

■■■ Under New York law, when an indemnitor had notice of the claim against it and an opportunity to take over the defense, the indemnitee need only show potential liability, *i.e.*, that indemnitee could have been found liable at the trial of

---

31. The same analysis applies to the fact that, for the purposes of the MDL Litigation in the Western District of North Carolina, Judge Voorhees established a class period that covered "at least the period April 1, 1999 through July 31, 2001." *See* Defs. Letter to the Court, dated June 1, 2010, Ex. C ¶ 2. Many plaintiffs in the MDL Litigation alleged pre-Closing antitrust activity, and the fact that this open-ended class period begins after the Closing would not prevent claimants from seeking damages for pre-Closing conduct.

32. The APA does not require an indemnitee to release the indemnitor as part of a settlement, but it does require the reciprocal: an "Indemni*fying* Party" who takes over the defense of a claim against an "Indemnified Party" can only settle that claim if the settlement includes a "written and unconditional release of the Indemni*fied* Party from all liability in respect of such action." APA § 17.4(a)(ii) (emphasis added). In this regard, it is worth noting that defendants declined the invitation to participate in the settlement process with the Koch Group.

33. The Civil Claims settlement agreements actually allocated payments to pre- and post-Closing time periods. *See* Nysenbaum Decl., Ex. 39. However, the Koch Group had an incentive to maximize pre-Closing damages, and to minimize post-Closing damages, in light of their indemnity claim in this suit. We therefore agree with defendants that those allocations should not be determinative of the calculation of damages on the indemnity claim.

the underlying action. *Waltz v. MRC Management, LLC,* 378 F.Supp.2d 440, 444 (S.D.N.Y.2005) (restating New York law); *Goldmark Indus. v. Tessoriere,* 256 A.D.2d 306, 681 N.Y.S.2d 327, 328 (2d Dept.1998); *Coleman v. J.R.'s Tavern, Inc.,* 212 A.D.2d 568, 622 N.Y.S.2d 334, 335 (2d Dept.1995). When the indemnitor had no notice or opportunity to defend, the indemnitee must demonstrate "actual liability" on the underlying claim. *See Atlantic Richfield Co. v. Interstate Oil Transport,* 784 F.2d 106, 113 (2d Cir.1986), *cert. denied,* 479 U.S. 817, 107 S.Ct. 75, 93 L.Ed.2d 31 (1986).

Defendants argue that "actual liability" must be shown in this case because they did not have notice or an opportunity to defend. We disagree. As discussed above, *see* Part I.E, plaintiffs properly satisfied the notice requirements of the APA. Once defendants had notice of the Civil Claims, they had the right to take over the defense of those claims pursuant to Section 17.4(a)(ii) of the APA. Defendants now argue that they lacked the opportunity to take over the defense of the Civil Claims because plaintiffs never "tender[ed]" the defense to them. Defs. Opp'n Mem. 26. However, nothing in the APA requires the Koch Group to "tender" the defense; Hoechst could have asserted its right to take over the defense, but chose instead to deny liability and to let the Koch Group incur the costs of defending and settling the Civil Claims.

■ Defendants also argue that plaintiffs had the burden of establishing actual liability at the time that plaintiffs first notified defendants of the Civil Claims. Defs. Opp'n Mem. 20–21. The APA requires that the indemnitee notify the indemnitor "[i]n the event that any Claim for which an Indemnifying Party would be liable to an Indemnified Party is asserted against ... such Indemnified Party by a third party." APA § 17.4(a)(i). Defendants read into this provision a requirement that plaintiffs establish, at the notice stage, that the third party claim is one for which defendants are actually—and not only potentially—liable. Oral Argument Tr. 49–50. But defendants' reading of Section 17.4(a)(i) leads to an absurd result. It cannot be that plaintiffs have to actually prove the underlying third party claim, almost immediately after the claim has been filed or a demand letter received, in order to provide adequate notice under the APA. Rather, the plain meaning of "would be liable" in Section 17.4(a)(i) conveys that notice should be provided if the indemnitee receives any colorable claim for which the indemnitor **would** be liable **if** the claim is ultimately proved at trial.

Accordingly, plaintiffs' burden on their indemnity claim is to show potential liability for the Civil Claims.

### C. Plaintiffs Faced Potential Liability for Alleged Pre–Closing Antitrust Conduct by Defendants

■ Since defendants had notice of the Civil Claims and an opportunity to participate in the defense, plaintiffs can obtain indemnity by showing that they faced potential liability for any Retained Liabilities under the APA, *i.e.,* for losses arising out of the operation of the Polyester Business prior to the Closing. As discussed above, many of the Civil Claims sought to recover from the Koch Group for pre-Closing antitrust wrongdoing, even though Hoechst operated the Polyester Business until the Closing date. Accordingly, the Koch Group could have been liable to the Civil Claims plaintiffs for the alleged pre-Closing conduct of Hoechst in violation of the antitrust laws.[34] In other words, whether

---

**34.** Defendants argue that the Koch Group could have avoided being held responsible for pre-Closing conduct by disclosing the terms of the APA to the Civil Claims plaintiffs, who in

the Koch Group faced potential liability for any Retained Liabilities turns on the question of whether Hoechst could be found liable for antitrust activity while it was operating the Polyester Business.

The record provides ample support to conclude that Hoechst could be found liable for antitrust wrongdoing. First, Troy Stanley testified that he participated in an antitrust conspiracy at the Polyester Business beginning three or four years before the Closing. PSF ¶ 100. Second, many third parties sued the Hoechst Group directly for damages relating to antitrust activity while Hoechst operated the Polyester Business, and Judge Voorhees of the Western District of North Carolina issued an order denying Hoechst's motion for summary judgment in the MDL Litigation on those claims. PFS ¶ 110; *see In re Polyester Staple Antitrust Litigation,* No. MDL 3:03–cv–1516(RLV), at *1, 2008 WL 906331 (W.D.N.C. filed Apr. 8, 2008). Although no opinion accompanied that order, the denial of Hoechst's motion for summary judgment represents, by definition, the court's determination that a reasonable factfinder could find Hoechst liable on the claims against it. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[35]

Third, Hoechst settled the third party claims against it for $107 million. PSF ¶ 111. The fact that Hoechst chose to settle those claims strongly suggests that it faced potential liability for antitrust activity at the Polyester Business during the period defendants operated it.[36] While we of course recognize that there are many reasons that litigants settle claims, and that potential liability is only one, it is difficult to believe that Hoechst had concluded that it had no potential liability, given the amount of settlement and lack of guarantee that the settlement amount could be passed on to another.

turn could have sued Hoechst. Defs. June 1, 2010 Letter, at 3. However, as we noted at Oral Argument, the Koch Group may have had prudent business reasons not to tell the Civil Claims plaintiffs that there was a second deep-pocketed company who could be sued for antitrust damages. Oral Argument Tr. 22. Furthermore, Hoechst declined to participate in defending the Civil Claims and cannot now raise issue with the Koch Group's litigation choices.

35. Defendants contend that another court's denial of summary judgment cannot be admitted as evidence to establish their liability here. However, "[a] court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.' " *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992) (quoting *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991)). In this instance, we do not rely on the truth of any matter asserted against Hoechst in the MDL Litigation. Rather, we take judicial notice of the fact that summary judgment was denied in that action for the limited purpose of determining whether Hoechst faced potential liability.

36. Defendants argue that their settlement is inadmissible evidence under Fed. R. Evidence 408. Rule 408 prohibits admission of a settlement when offered to prove a defendant's liability, but does not prohibit evidence of settlements offered for other purposes. Fed. R. Evidence 408(b); *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC,* 646 F.Supp.2d 385, 404 (S.D.N.Y.2009); *see also Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 293 (2d Cir., 1999) ("The trial judge has broad discretion as to whether to admit evidence of settlement ... offered for another purpose." (internal quotations omitted)). In the present case, plaintiffs' only burden is to show potential liability; they are not seeking to show that defendants were actually liable for the conduct alleged in the settled suits. It is unclear whether Rule 408 prohibits evidence of settlement under these circumstances. We do not resolve the issue here, since, even if defendants' settlement were inadmissible, plaintiffs have provided other evidence sufficient to establish potential liability.

## D. The Settlements Were Reasonable and In Good Faith

██ "Under New York law, 'when an indemnitor has notice of the claim against it, the general rule is that the indemnitor will be bound by any reasonable good faith settlement the indemnitee might thereafter make.'" *Waltz*, 378 F.Supp.2d at 442 (quoting *Fidelity Nat'l Ins. Co. of N.Y. v. First N.Y. Title & Abstract Ltd.*, 269 A.D.2d 560, 707 N.Y.S.2d 112, 113 (2d Dept.2000)); *see Goldmark*, 681 N.Y.S.2d at 328; *Coleman*, 622 N.Y.S.2d at 335. Since the Koch Group provided Hoechst with adequate notice, the operative question is whether the Civil Claims settlements were reasonable and in good faith.

██ In the context of indemnification, courts routinely find settlements to be "reasonable" when the recovery at trial could have been greater. *See, e.g., Pahl v. Grenier*, 279 A.D.2d 882, 719 N.Y.S.2d 370, 372 (3d Dept.2001) (settlement reasonable where "a verdict in favor of plaintiffs was by no means unlikely and, if rendered, could well have resulted in a greater award of damages"); *Shihab v. Bank of New York*, 211 A.D.2d 430, 620 N.Y.S.2d 379, 381 (1st Dept.1995) (proposed settlement for approximately $15,000 less than third party's $75,000 claim "must be deemed to be one made in reasonable good faith" (internal quotation omitted)). Here, the Koch Group faced potential damages far in excess of the $76 million they paid in settlements. The Civil Claims plaintiffs presented expert reports calculating damages at over $325 million, which were subject to trebling if the Koch Group were found liable on the antitrust claims. PSF ¶ 108. In addition, defendants settled their own pool of third party claims for approximately $107 million, which exceeds plaintiffs' settlement amount by $31 million. Accordingly, we find plaintiffs' settlement payments to be reasonable.

The Koch Group's settlements of the Civil Claims were also in good faith. Defendants have presented no evidence to suggest that plaintiffs settled hastily or without sufficient investigation. In fact, plaintiffs attempted to involve defendants in settlement negotiations, explaining that they did "not want any subsequent dispute . . . about whether the terms of [the] proposed settlement are fair and reasonable." PSF ¶ 96. Furthermore, courts can presume an indemnitee's good faith where the indemnitee's self-interest would require it to seek a favorable settlement, such as where an indemnitee faces "potential liability for some or all of [third party] plaintiffs' damages." *Waltz*, 378 F.Supp.2d at 443–44. Here, the Koch Group had every incentive to minimize the amount it paid in settlement because (a) Hoechst repeatedly denied its indemnity obligation, as it continues to do in this litigation, and (b) the Koch Group knew it would be responsible for the portion of the Defense Costs that are not "Retained Liabilities" under the APA. We therefore find that plaintiffs' settlements were made in good faith.

## E. Defendants Fail to Raise Genuine Issues of Material Fact on the Indemnity Claim

There are no genuine issues of material fact relating to defendants' liability, under the APA's indemnity provision, for part of the Defense Costs. Defendants' opposition brief proposes many issues of fact, but these are either resolved by undisputed facts or they are not material to plaintiffs' indemnity claim. In the former category, defendants contend that there are factual issues concerning whether plaintiffs complied with the APA's notice and consent provisions. As discussed above, *see* Part I.E, facts undisputed by the parties demonstrate that plaintiffs complied with the APA's notice and consent requirements. Similarly, there is no genuine issue of ma-

terial fact concerning whether a portion of the Defense Costs represents Retained Liabilities under the APA, *see* Part II.A, or whether plaintiffs' settlements were reasonable and in good faith, *see* Part II.D.

Defendants' remaining arguments raise issues that are not material to plaintiffs' indemnity claim. In their opposition brief, defendants assert that "Plaintiffs can only obtain summary judgment by showing that there is no genuine issue of material fact that Defendants participated in a pre-Sale price-fixing conspiracy." Defs. Opp'n Mem. 28. We disagree. Since defendants had notice and an opportunity to participate in the defense, plaintiffs' can obtain indemnity from defendants by showing that they faced "potential liability" for third party claims that constitute Retained Liabilities under the APA. *See* Part II.B. Thus, to succeed on their motion for summary judgment, plaintiffs need not demonstrate the absence of factual issues concerning whether the Hoechst Group actually engaged in pre-Closing antitrust activity.

Similarly, plaintiffs can obtain indemnity for part of the Defense Costs even though the question of whether defendants breached the APA's representations and warranties presents a genuine issue of material fact. We grant plaintiffs summary judgment on their claim for indemnity for Retained Liabilities (Count IV), but not on their claim for breach of representations and warranties (Count V). These two claims are distinct causes of action arising from separate provisions in the APA. *Compare* APA § 17.2(a)(i) *with* APA § 17.2(a)(ii).

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion for summary judgment is granted on the fraud claims (Counts I, II, and III) because they are duplicative of plaintiffs' contract claims. Defendants' motion is also granted on the unjust enrichment claim (Count VI) because the subject of this suit is governed by a valid contract. However, we reject defendants' arguments in support of their motion for summary judgment on plaintiffs' contract claims (Counts IV and V).

Plaintiffs' motion for partial summary judgment is granted only with respect to defendants' liability on the indemnity claim (Count IV). Plaintiffs have satisfied their burden at summary judgment to show that defendants are liable, under the indemnification provision of the APA, for a portion of the Defense Costs that constitutes "Retained Liabilities." The calculation of proper damages on the indemnity claim remains an issue for trial.

Accordingly, plaintiffs' motion for partial summary judgment is granted, and defendants' motion for summary judgment is granted on Counts I, II, III, and VI, and denied on Counts IV and V.

**IT IS SO ORDERED.**